**UNITED STATES of America**

v.

**Frankie CROCKER, Appellant.**

No. 77–1358.

United States Court of Appeals, Third Circuit.

Argued Oct. 7, 1977.

Decided Nov. 29, 1977.

Herald Price Fahringer, Lipsitz, Green, Fahringer, Roll, Schuller & James, Buffalo, N. Y., Michael B. Pollack, New York City, for appellant.

Melvin S. Kracov, Asst. U. S. Atty., Newark, N. J., Jonathan L. Goldstein, U. S. Atty., Robert M. Romano, Asst. U. S. Atty., Newark, N. J., for appellee.

Before GIBBONS and WEIS, Circuit Judges, and WRIGHT,* District Judge.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

This is an appeal from a judgment of sentence following a conviction on one count of a two-count indictment for knowingly making false declarations before a grand jury in violation of 18 U.S.C. § 1623. Appellant Frankie Crocker asserts several grounds for reversing the lower court's judgment. First, he contends that the indictment must be dismissed because the prosecutor failed to warn him that he was a target of the grand jury investigation, be-

---

* Honorable H. Curtis Meanor, United States District Judge for the District of New Jersey, sitting by designation.

cause his allegedly perjurious answers were not material as a matter of law, or because the indictment did not sufficiently allege the materiality of the untruthful answers. Second, the appellant contends that he is entitled to a new trial because the admission of evidence of other crimes amounted to a constructive amendment of the indictment. Third, he argues that his sixth amendment right of confrontation was violated by the district court's order precluding the use of a tape recorded interview of one of the government's witnesses. Finally, he contends that the evidence was insufficient to support the conviction. Although we reject appellant's other contentions, we agree that the district court's admission of evidence of other crimes amounted to a constructive amendment of the indictment. Consequently, we hold that there must be a new trial.

## I. FACTS AND PROCEEDINGS BELOW

In 1973 several federal grand juries in Newark, New Jersey, began investigating alleged criminal wrongdoing in the music recording industry. The investigations concerned reports that illicit cash payments were being made to radio program directors, announcers, and others from a fund created through the use of fictitious companies and through padding of convention expenses. Independent record promotion men were allegedly used as conduits for payments. Such activities could involve violations of the tax laws, 26 U.S.C. § 7201 et seq., the mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, the anti-racketeering statute, 18 U.S.C. § 1952, the conspiracy law, 18 U.S.C. § 371, and the Communications Act, 47 U.S.C. § 508. Crocker was at the time the program director and a featured disc jockey of radio station WBLS–FM in New York City. As program director he was responsible for the station's musical format. Each week he reviewed single records and record albums released by record manufacturers and drew up the station's playlist.[1] Crocker was subpoenaed to appear before one of the Newark grand juries on August 16, 1974, and was examined by an Assistant United States Attorney. In the course of that interrogation he was asked if he had ever received cash or merchandise from a record company or its representative to influence his decisions on what records would be played on the radio stations with which he had been affiliated. Crocker answered this question in the negative.

In August, 1975, Ellsworth Groce, owner of Rocky G. Promotions, Inc., of Teaneck, New Jersey, was subpoenaed to testify before the Newark grand jury. Groce was an independent record promotion man hired from time to time by about twenty record companies to secure air play for their new releases at various East Coast radio stations, including WBLS. In lieu of a grand jury appearance, Groce appeared with counsel at the United States Attorney's office in Newark, where under questioning he admitted making cash payments to Crocker and to others. Meanwhile the investigations had uncovered evidence that Harry Coombs, the Executive Vice-President of Philadelphia International Records, had been promoting that company's records and those of Gamble-Huff Records, Inc., and Assorted Music, Inc., by paying cash to radio program directors. Coombs was indicted in Philadelphia and later pleaded guilty to conspiracy and substantive violations of the Communications Act.

On September 15, 1975, Crocker was subpoenaed to appear before a Newark grand jury for a second time. The instant indictment, returned on May 13, 1976, is a result of that appearance. After describing Crocker's position at WBLS, both counts of the indictment allege the following:

3. The aforesaid Grand Jury was then concluding an investigation into allegations of criminal wrongdoing within the recording industry including allegations

---

1. In addition, within the playlist, Crocker selected a limited number of singles to be given preferred air play.

that various record companies had engaged in the practice of providing United States currency, merchandise, or other goods and services to employees of radio stations licensed by the Federal Communications Commission in order to influence the selection of records to be broadcast to the listening public by the aforesaid station.

4. It was material to the aforesaid investigation to ascertain whether the defendant FRANKIE CROCKER had received any money, directly or indirectly, from a record company or a representative thereof.

The first count then described Ellsworth Groce's position as an independent record promoter. It set forth the relevant parts of Crocker's testimony at his second appearance before the grand jury. The testimony is quoted in full in the margin.[2] Referring to the quoted testimony, Count I then alleged:

8. The declarations of the defendant FRANKIE CROCKER, as set forth in paragraph 7 of this Count, were false in that, during the years 1974 and 1975, Ellsworth Groce, also known as Rocky G, gave in excess of $10,000 in cash to the defendant FRANKIE CROCKER to promote the musical records of the companies referred to in paragraph 6 of this Count.

The second count described the position of Harry J. Coombs as an employee of Gamble-Huff Records and Assorted Music, Inc., who was responsible for the promotion of their records. It again set forth Crocker's grand jury testimony, which is quoted in full in the margin.[3] Referring to this testimony, Count II then alleged:

5. The declaration of the defendant FRANKIE CROCKER, as set forth in paragraph 4 of this Count, was false in that on or about December 12, 1973, Harry J. Coombs gave $400 in cash to said defendant.

On the trial of the indictment, the jury acquitted Crocker on the second count, but

---

2. Q. Have you ever received cash from Rocky G?
A. *No.*
Q. Never?
A. Well, yeah, I received cash from Rocky G, but not—you asked me if I ever received cash. I guess you better clarify that.
 * * * * * *
Q. Let me clarify it then. When you were Program Director and he was a promotion man and—
A. *Oh, no.*
Q. Did he ever give you cash?
A. *No.*
Q. Never?
A. *No.*
Q. For any reason—
A. *I can't think of any.* No, Rocky and I—in other words,—
Q. I understand that, Mr. Crocker. My question is: Did he ever give you any cash?
A. For what?
Q. For anything.
 * * * * * *
A. . . . I don't know if Rocky and I—obviously we must have exchanged cash sometime. *It's been 10 years since I've known him but Rocky has never given me money for records* . . .
Q. . . . Again, I would like to narrow it down to the time when you were Program Director and he was a promotion man. Did he ever give you cash?

A. *Like I say, he's never given me cash for records. That I would have remembered.*
 * * * * * *
Q. Was there any occasions since you've been a Program Director and Mr. Groce has been a promotion man when he's given you money?
A. *No.*
Q. I'm talking cash now.
A. *Same answer. Well, I have said this before, that I don't take money for records* . . .
 * * * * * *
Q. Did Rocky G ever give you $500 in cash?
A. *No, not unless I worked for it.*
Q. Again, at the time that you were Program Director and—
A. *No, because I haven't worked for him since then. No, he hasn't.*
Q. Did he ever give you $200 in cash?
A. *No.*
Q. For any reason?
A. *No.*

3. Q. Do you know Harry Coombs?
A. Yes, I know Harry.
Q. He's a promotion man for Gamble-Huff Records, Philly International; isn't that correct?
A. Right.
Q. Did you ever receive any money from him?
A. *No.*

found him guilty on Count I. The court had instructed the jury to determine, separately with respect to each answer, whether Crocker had testified falsely. The jury found that twelve of fourteen answers were false. The answers found by the jury to have been false are italicized in the testimony quoted in footnote 2. Crocker was sentenced on Count I and this appeal followed.

## II. CROCKER'S CHALLENGE TO THE INDICTMENT

Crocker mounts two attacks on the indictment. The first—the failure to warn him that he was a target defendant—deals with the manner in which the indictment was procured. The second—the materiality contention—deals with its legal sufficiency. We will deal with these contentions separately.

### A. Failure to Warn a Target Defendant

When Crocker was first subpoenaed to appear before the grand jury on August 16, 1974, his then attorney, Thomas Nerangis, first met with Robert Romano, an Assistant United States Attorney in Newark. Nerangis told Romano that he did not practice criminal law and that if Crocker was a target of the grand jury's inquiry, he wished to be so advised so that he could arrange for the retention of a criminal lawyer for him. Romano advised Nerangis and Crocker that the latter was not a target, although the investigation had disclosed that Crocker had received record company promotional monies. Crocker was given a Miranda warning and was questioned for about an hour by Romano. Crocker then appeared before the grand jury, where the Miranda warning was repeated and where he was specifically warned that he was under oath and that he could be prosecuted for perjury. At this grand jury session he made the general denial of having received money for playing records referred to in Part I.

When Crocker was recalled before the grand jury in September, 1975, the government had in its possession statements by Groce and Coombs that Crocker had received such payments. Nerangis, who, so far as the record discloses, did not know of the Groce and Coombs allegations, asked Romano if Crocker's status as a nontarget had changed. Romano answered that Crocker's status had not changed. When Crocker appeared before the grand jury, he was again given Miranda warnings and told that he was under oath and that he could be punished criminally for perjury.

Crocker contends that although he was in fact a target of the grand jury's investigation, Romano misled his attorney by representing that he was not. He urges, with particular reliance upon United States v. Jacobs, 547 F.2d 772 (2d Cir. 1976), cert. granted, 431 U.S. 937, 97 S.Ct. 2647, 53 L.Ed.2d 254 (1977),[4] that the prosecutor's failure to warn him that he was a potential target of the grand jury investigation, especially when he specifically asked about his status, was a violation of due process of law, thereby requiring his grand jury testimony to be suppressed. He urges, moreover, that the purpose of the second grand jury subpoena was to set the stage for a perjury charge, since if he admitted receiving money he could be indicted for testifying falsely in his initial appearance, while if he denied it the government would rely on the testimony of Groce and Coombs to have him indicted for his testimony in the second appearance. Thus, he contends, it would be far more consistent with fair play to have warned him of any conflict between his earlier testimony and the inconsistent versions of Groce and Coombs.

The government's initial response to Crocker's argument about a duty to warn, or at least not to mislead, is that Crocker

4. The Second Circuit initially enunciated the Jacobs rule in United States v. Jacobs, 531 F.2d 87 (2d Cir. 1976). On appeal, however, the Supreme Court vacated this ruling and remanded the case to the circuit court "for further consideration in light of United States v. Man-

dujano, 425 U.S. 564 [96 S.Ct. 1768, 48 L.Ed.2d 212] (1976)." 429 U.S. 909, 97 S.Ct. 299, 50 L.Ed.2d 277 (1976). On remand, the Second Circuit reaffirmed its previous ruling. 547 F.2d 772 (2d Cir. 1976).

was "not a 'target' of the record industry investigation in the sense that he was about to be indicted for having received payola." Appellee's Brief, at 16–17. In support of this argument, the government relies both on Romano's testimony in the district court that the recipient of a payment illegal under 47 U.S.C. § 508 would "not necessarily" have been indicted and on the fact that Crocker has not been indicted for the substantive offense of receiving an illegal payment. Appellee's Brief, at 17.

■ We reject what we regard as a somewhat disingenuous argument that Crocker was not a target of a grand jury investigation on September 15, 1975. First, the test as to whether a witness is a target of a grand jury investigation cannot be whether he "necessarily" will be indicted, but whether according to an objective standard he could be indicted. Patently Crocker was a potential defendant in an indictment for violating 47 U.S.C. § 508. Even construing Romano's testimony as an indication that he did not intend to seek a § 508 indictment, his subjective intention cannot be determinative, since a superior in the Justice Department or theoretically even an independent grand jury might disagree and cause an indictment to be brought against Crocker. Finally, even if Crocker was not a target in the 47 U.S.C. § 508 investigation, he was certainly, by September 15, 1975, a target in a grand jury investigation for possible false swearing in violation of 18 U.S.C. § 1623, an offense which carries a maximum jail sentence five times higher than does 47 U.S.C. § 508. The government had information suggesting that he lied in his first grand jury appearance and that he would be likely, absent a warning about such information, to lie again. Concededly, the United States Attorney's office might have been motivated in part by its desire to expand and bring to an end its record industry payola investigation. But that motivation is not enough to disregard the plain evidence that the government was also interested in Crocker's alleged false swearing. Thus if suppression of the September 15, 1975, grand jury testimony were to turn on whether or not Crocker was a target of the investigation, we would have to hold that he was a target and that the testimony would have to be suppressed.

■ But the fact that Crocker was a target of the grand jury investigation does not mean that he must have been warned more adequately than in this instance. Recent Supreme Court decisions suggest otherwise.

In *United States v. Mandujano*, 425 U.S. 564, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1975), the Court considered

> whether the warnings called for by *Miranda v. Arizona*, 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694] (1966), must be given to a grand jury witness who is called to testify about criminal activities in which he may have been personally involved; and whether, absent such warnings, false statements made to the grand jury must be suppressed in a prosecution for perjury based on those statements.

*Id.* at 566, 96 S.Ct. at 1771. The Court reversed the Fifth Circuit Court of Appeals, which had affirmed a district court order suppressing the testimony. The Court's plurality opinion noted that the atmosphere of police coercion which prompted the *Miranda* ruling differed markedly from that of a grand jury investigation and concluded that no warnings in addition to the language of the oath were required. Justices Brennan and Marshall, while concurring in the judgment within the context of a perjury prosecution, disavowed the suggestion in Chief Justice Burger's plurality opinion that the government could use a grand jury subpoena to coerce testimony of criminal conduct absent an effective waiver. *Id.* at 598–600, 96 S.Ct. 1768 (Brennan, J., concurring). Justices Stewart and Blackmun would not have addressed the warnings issue, and Justice Stevens did not participate. Significantly, however, six Justices, including Justices Brennan and Marshall, agreed that following warnings similar to those given in this case, a perjury prosecution was permissible. Of course, *Mandujano* is technically distinguishable since that case involved a single grand jury appearance.

Thus, there was no contention, as there is in the instant case, that *Mandujano* was the target of an investigation into prior perjury.

On May 23, 1977, the Supreme Court decided two relevant cases, *United States v. Wong*, 431 U.S. 174, 97 S.Ct. 1823, 52 L.Ed.2d 231 (1977), and *United States v. Washington*, 431 U.S. 181, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977). In *Wong*, a unanimous Court held that a grand jury witness who was under investigation for her own criminal activity and who was later indicted for perjury was not entitled to be warned of the privilege against self-incrimination prior to her grand jury testimony. Chief Justice Burger's opinion for the Court expressly rejected the contention that a failure to warn a target defendant violated due process. In *Washington*, the issue was whether testimony given by a grand jury witness could be used against him in a subsequent prosecution when he had not been informed that he was a potential defendant in danger of being indicted. The Court held that the test for admissibility was not the absence of a "target" warning, but "whether, considering the totality of the circumstances, the free will of the witness was overborne." 431 U.S. at 188, 97 S.Ct. at 1819. Only Justices Brennan and Marshall dissented.

In *Wong* the defendant was a target of an investigation into bribery and was indicted for perjury, while in *Washington* the defendant was indicted for theft, for which he was the target suspect. Appellant attempts to distinguish these cases on the ground that here he was a target for an investigation into a possible prior perjury. This difference does not serve as a legal distinction. *Wong* and *Washington* rejected the contention that there was a due process obligation to do anything more than inform the witness of the dangers of testifying falsely by administering an oath. More was done here. Crocker was warned of the possibility of prosecution for perjury if he testified falsely.

But, says Crocker, *Mandujano*, *Wong*, and *Washington* were not instances in which the United States Attorney, in response to a specific inquiry as to the defendant's status, gave a misleading answer. That is true, and that aspect of the case is quite troublesome. It seems likely that had Romano stated that he had information that Crocker had lied in his 1973 testimony, Nerangis would have urged his client to plead the privilege against self-incrimination rather than face the Hobson's choice of being indicted for one or the other grand jury appearance, or both.[5] But while it might have been fairer if Romano had been more forthcoming, we cannot, in the face of *Mandujano*, *Wong*, and *Washington*, elevate our own notions of fair conduct into due process requirements.

■ Crocker argues that we need not go that far. He points out that in *United States v. Jacobs*, 547 F.2d 772 (2d Cir. 1976), *cert. granted*, 431 U.S. 937, 97 S.Ct. 2647, 53 L.Ed.2d 254 (1977), the Second Circuit, after a remand for reconsideration of a suppression motion in light of *Mandujano*, exercised its supervisory powers over the manner in which grand jury proceedings are conducted to affirm an order suppressing grand jury testimony and dismissing a perjury indictment because a strike force attorney had not followed the uniform practice among United States Attorneys in that circuit for over twenty years of warning target defendants that they were subjects of a grand jury investigation. We have asserted the same powers of supervision which Judge Gurfein in *Jacobs* claimed for the Second Circuit. *See In re Grand Jury Proceedings (Schofield)*, 486 F.2d 85, 93 (3d Cir. 1973). But, unlike the practice in the Second Circuit, there is no suggestion that the practice of giving such warnings is long-established among the United States Attorneys of this Circuit. In addition, although we have recognized that we have supervisory authority over the conducting of grand jury proceedings, we have declined to exercise that power to require warnings

---

**5.** Alternatively, Crocker might have requested use immunity in exchange for his cooperation with the government in the latter's investigation of the music recording industry.

of a statutory recantation right. *Compare United States v. Lardieri*, 506 F.2d 319, 323–25 (3d Cir. 1974) *with United States v. Lardieri*, 497 F.2d 317, 320–21 (3d Cir. 1974).[6] *See also United States v. DiMichele*, 375 F.2d 959 (3d Cir.), *cert. denied*, 389 U.S. 838, 88 S.Ct. 54, 19 L.Ed.2d 100 (1967). One consideration in determining whether to apply an expanded warning rule pursuant to our supervisory powers is the extent to which government attorneys may justifiably have relied on our prior endorsement of the practice of omitting warnings. Certainly the uniform practice of warning target witnesses before grand juries in the Second Circuit has much to commend it, and we endorse that practice. Thus in the future, United States Attorneys in the Third Circuit should not be surprised if, pursuant to our supervisory powers over the manner of conducting grand jury proceedings, we were to follow *United States v. Jacobs, supra*, especially where, as here, specific inquiry is made on the defendant's behalf. But in view of the warnings actually given and of Crocker's knowledge of the subject of the grand jury's general investigation, we decline to hold that his testimony before the grand jury on September 15, 1975, should be suppressed and the indictment dismissed because, although his attorney inquired, he was not warned that he was a target of the grand jury's investigation.

Nor, on this record, are we prepared to hold that the grand jury testimony should be suppressed and the indictment dismissed because Romano misled Crocker's attorney. The record is clear that at all times both Nerangis and Crocker were well aware of the penalties for false swearing. At the outset of Romano's first interview, prior to the first grand jury appearance, Crocker was informed that some persons in the industry had suggested that Crocker had received money. Lack of candor by government prosecutors in making disclosures can in some instances amount to a due process violation. *See Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). But while we agree with Crocker that Romano may have misled Nerangis by suggesting that his client was not a target at the time of the second appearance, we do not think that Romano's statement, in circumstances in which according to the Supreme Court he need not have said anything, can be held to be a due process violation. Moreover, on the precise record here we do not believe it is appropriate to suppress the testimony or dismiss the indictment in the exercise of our supervisory powers on the ground that Nerangis was misled.

### B. Materiality

Crocker urges that the indictment should be dismissed because (1) the indictment insufficiently alleges materiality and (2) in any event the allegedly perjurious answers in Count I were immaterial as a matter of law. We will consider these contentions separately.

### 1. Sufficiency of Materiality Allegations in the Indictment

██ In *United States v. Slawik*, 548 F.2d 75 (3d Cir. 1977), we observed that both under the perjury statute, 18 U.S.C. § 1621, and under the false declarations statute, 18 U.S.C. § 1623, materiality is an essential element of the offense and a question of law reserved for decision by the court. An indictment in the language of the statute which fails to disclose in what respect the testimony was material to a proper subject of grand jury inquiry would make it impossible for a reviewing court to determine whether the defendant was indicted for testimony which could under the statute be criminal. Moreover, an indictment in the language of the statute followed by a general verdict would prevent a reviewing court from determining whether a petit jury had convicted for testimony which could under the statute be criminal.[7] The

---

6. We note with approval that the Assistant United States Attorney did offer Crocker an opportunity to recant at the end of his grand jury testimony.

7. The judicial review problem in this context is analogous to that facing the Supreme Court when it reviews a state court's general verdict of guilty under a statute which on its face

government cannot, as a matter of due process, conceal from judicial review, by an indictment in the language of a statute or by a general verdict, the question whether the defendant's conduct actually was a crime. Thus in *Slawik* we held that, to enable us to perform the review function, an indictment should explicate in what manner the alleged falsity affected the grand jury's deliberations.[8]

■ Crocker claims that the allegations of materiality in Count I quoted in Part I are insufficient under *Slawik.* We disagree. While the statement of materiality in paragraph 3 might have been clearer, read in conjunction with the description of Crocker's and Groce's respective positions in the music recording industry, it suffices to establish that testimony denying receipt of payola would, if false, tend to impede an investigation into the practice of providing currency, merchandise, or other goods and services to employees of licensed radio stations to influence the selection of records. The issue, then, is not whether we have been sufficiently informed of the claimed materiality of the false statement, but whether the testimony is material as a matter of law.

### 2. Materiality as a Matter of Law

■ Crocker's alternative argument is that the testimony is, as a matter of law, immaterial to any investigation which a Newark, New Jersey, grand jury could lawfully conduct because venue for prosecution of 47 U.S.C. § 508(a) could only lie in New York City. That statute prohibits an employee of a radio station from accepting money, service, or other valuable consideration without disclosing the acceptance to the station. Since WBLS is located in New York City, Crocker urges that failure to disclose could only occur there and thus that venue only lies there.

In support of this argument, Crocker relies primarily on the Supreme Court's decision in *Travis v. United States,* 364 U.S. 631, 81 S.Ct. 358, 5 L.Ed.2d 340 (1961). In *Travis,* the petitioner was charged with making and filing false non-Communist affidavits required by § 9(h) of the National Labor Relations Act, as amended by the Taft-Hartley Act, 61 Stat. 136, 146, and further amended by the Act of Oct. 22, 1951, § 1(d), 65 Stat. 601, 602. The indictment alleged that the false writings were executed in Colorado and filed in Washington, D. C., with the National Labor Relations Board. The petitioner was tried and convicted in a federal district court in Colorado. Reversing the conviction, the Supreme Court reasoned that the criminal offense occurred at the place of filing and thus that venue did not lie in Colorado.

> The *locus* of the offense has been carefully specified; and only the single act of having a false statement at a specified place is penalized. . . . We conclude that venue lay only in the District of Columbia.

364 U.S. at 637, 81 S.Ct. at 362.

The instant case is distinguishable from *Travis* in three respects. First, venue in *Travis* was controlled by the general venue statute for all offenses against the United States, while venue in the instant case is

---

proscribes both protected and unprotected speech or assembly.

8. In support of his argument, Crocker relies primarily on the following language from our *Slawik* opinion:

> The indictment did not state why or how these three areas of inquiry were matters material to the grand jury's investigation. 548 F.2d at 79.

> Rather, we hold that a conviction under 18 U.S.C. § 1623 may not stand where the indictment fails to set forth the precise false-

hood alleged and the factual basis of its falsity with sufficient clarity to permit a jury to determine its verity and to allow meaningful judicial review of the materiality of those falsehoods. To hold otherwise would permit the trial jury to inject its inferences into the grand jury's indictment, and would allow defendants to be convicted for immaterial falsehoods or for "intent to mislead" or "perjury by implication"—which [*Bronston v. United States,* 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973)] specifically prohibited. *Id.* at 83–84.

controlled by § 505 of the Communications Act, 47 U.S.C. § 505, which applies specifically to offenses under that chapter. Section 505 provides:

> The trial of any offense under this chapter shall be in the district court in which it is committed; . . .. Whenever the offense is begun in one jurisdiction and completed in another it may be dealt with, inquired of, tried, determined, and punished in either jurisdiction in the same manner as if the offense had been actually and wholly committed therein.

Second, the crime in *Travis*—false filing— involved the same individual in both the executing and the filing of the false document. The offense here, by contrast, requires that one person give the money and that another person receive and fail to disclose it. Under § 505, venue for trial, and thus a fortiori for a grand jury investigation of violations of 47 U.S.C. § 508(a), would lie in New York, New Jersey, or any other district in which steps—i. e., payment, receipt, or failure to disclose—were taken to accomplish the concealment of illegal payments. Since Groce and certain record manufacturers being investigated were centered in New Jersey, venue would properly lie there. Moreover, the grand jury investigations were not restricted either to Crocker or to violations of 47 U.S.C. § 508. Rather, the grand jury was also inquiring into possible violations of the tax laws, the mail and wire fraud statutes, the anti-racketeering statutes, and the conspiracy law. Clearly the various activities being investigated had a sufficient nexus to New Jersey to create venue in New Jersey for the grand jury investigations.

We conclude that Count I of the indictment sufficiently alleged materiality and that the false testimony alleged was material to an investigation which the New Jersey grand jury had authority to conduct. Thus, we reject Crocker's challenge to the legal sufficiency of the indictment. That indictment, we believe, was properly brought to trial.

## III. EVIDENCE OF OTHER CRIMES

Over timely and strenuous objection of defense counsel, the government at Crocker's trial produced as a witness Charles Bobbit, who testified that he had given Crocker money for playing specific records on numerous occasions both while Crocker was at WBLS and several years before, when Crocker was an announcer at another radio station. Defense counsel objected to Bobbit's testimony because: (1) the acts alleged by Bobbit were neither charged in the indictment nor discussed in Crocker's grand jury testimony, and (2) the prejudicial impact of the testimony far exceeded its probative value. Initially the trial judge excluded the testimony, observing:

> If I were representing the defendant, gentlemen, and I were faced with preparing for their prosecution, I would have to say in all fairness to the defendant here as to defendant's counsel here, that Count 1 was strictly Groce.
>
> There is a basic unfairness at this stage in this trial in bringing in another witness. If you are going to use this as a basis for a prosecution, you are not barred by what I am doing. You always can institute a second prosecution which will fairly apprise the defendant of what he has to meet.
>
> I think that running through all this it has been Groce over and over again. The opening was Groce, and while I understand the importance and significance of the testimony to the United States, nonetheless I feel that in the interest of fairness, I have to bar the proof. I will therefore sustain the objection of the defendant to its admission.

The district court at first excluded the evidence for all purposes, both as substantive proof on Count I and as proof of motive, intent, or plan under Rule 404(b) of the Federal Rules of Evidence. The district judge stated:

> I think it has such inherent prejudice in it, that any relevancy it does have on the 404(b) issue is substantially outweighed by the danger of undue prejudice therefrom, specifically under 403, and it will

therefore be barred from admission on that basis.

In ruling that the Bobbit testimony was inadmissible as substantive proof of Count I, the court's statement that "it has been Groce over and over again" undoubtedly was prompted by the allegation in paragraph 8 of that count, quoted in Part I above, that Crocker's testimony was false in that Groce had given him in excess of $10,-000 in cash.

Several days later the trial judge reversed his ruling. He concluded that Bobbit's testimony was admissible as substantive proof that Crocker had lied in some of the respects charged in Count I. Conceding that the series of questions set forth in paragraph 7 of Count I were directed to the receipt of cash from Groce, he reasoned:

> [Crocker] then elaborated upon his answer to take the matter beyond a narrow response to the question that had been related to Groce, a response upon which the Government relies in claiming that Crocker lied. Thus he stated as follows (Page 13, Line 6):
>
>> Well, I have said this before, that *I don't take money for records.* You keep asking me that, and you keep asking me if Rocky has given me any money.
>
> * * * * * *
>
> It is the Court's view that given a literal construction, the response "I don't take money for records" was untrue if the Bobbit testimony . . . is true.

(emphasis supplied). Referring to the fact that in this instance the grand jury in paragraph 8 of Count I specified quite carefully that the alleged falsity involved Groce, not Bobbit, the court observed:

> First of all, it is correct to say that the Government is not bound by the "truth" paragraph of Count One since any such paragraph is surplusage. *See United States v. Nickels,* 502 F.2d 1173 at 1177 (7th Cir. 1974), *cert. denied,* 426 U.S. 911, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1976); *United States v. Marchisio,* 344 F.2d 653 at 662 (2d Cir. 1965).

The district court did not yet have our almost simultaneous opinion in *United States v. Slawik,* 548 F.2d 75, 87 (3d Cir. 1977), in which we stated that "[t]he grand jury must charge specifically what it believes are the true facts." Nor did the district court address the issué of whether the grand jury believed that Crocker's concededly unresponsive answer to a specific question about Groce was at all material except in reference to Groce.

Crocker urges that there is no indication whatsoever that his dealings with Bobbit formed a basis for the grand jury's indictment and that the fifth amendment precludes him from being convicted on a charge that the grand jury did not make.

 It is, of course, elementary that neither the prosecutor nor the trial court may constitutionally amend a federal indictment. *Ex Parte Bain,* 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1886). The Supreme Court has recognized, however, that if there is no amendment of the indictment, but only a variance between the facts alleged in the indictment and the evidence offered at trial, the problem is not one of usurping the constitutionally guaranteed role of the grand jury, but one of promoting the fairness of the trial and ensuring the defendant notice and an opportunity to be heard. *See, e. g., Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *Berger v. United States,* 295 U.S. 78, 81–82, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). The variance rule, to the extent that it is constitutionally required, is more of a due process rule than is the flat fifth amendment prohibition against being tried on an indictment which a grand jury never returned.

In *Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), however, the Supreme Court recognized that even though a trial court did not formally amend an indictment, it could accomplish the practical result of trying a defendant on a charge for which he was not indicted by a grand jury if it permitted proof of facts on an essential element of an offense which were different than those charged in the

indictment. The trial court would not be permitted, in the guise of a variance, to accomplish a constructive amendment so as to modify the facts which the grand jury charged as an essential element of the substantive offense. This was true even though, as the *Stirone* opinion acknowledged, the indictment could have been drawn in general rather than in specific terms.[9] The consequence of a constructive amendment is that the admission of the challenged evidence is *per se* reversible error, requiring no analysis of additional prejudice to the defendant.

This court has applied the foregoing rules on constructive amendments and variances with different results depending on the elements of the offense, the allegations of the indictment, and the nature of the evidence. *See, e. g., United States v. Goldstein,* 502 F.2d 526 (3d Cir. 1974); *United States v. Somers,* 496 F.2d 723 (3d Cir.), *cert. denied,* 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974); *United States v. DeCavalcante,* 440 F.2d 1264 (3d Cir. 1971); *United States v. Smith,* 474 F.2d 844 (3d Cir.), *cert. denied,* 411 U.S. 970, 93 S.Ct. 2162, 36 L.Ed.2d 692 (1973); *United States v. Critchley,* 353 F.2d 358 (3d Cir. 1965). In *Somers,* this court construed a specific date reference in a Hobbs Act indictment, qualified by the words "on or about", as a reference to a general time frame. The court concluded that proof of Hobbs Act violations outside the general time frame amounted not to a constructive amendment, but to only a variance. In *Goldstein,* on the other hand, when a filing date was a substantial element of the offense, going to the requisite mens rea, we held that the proof of a different filing date did constitute a constructive amendment. Relying on the cases in other circuits referred to by the trial court in its second ruling which admitted the Bobbit testimony, the government urges that the allegations in paragraph 8 of the indictment were mere surplusage. But

even if those cases stand for the proposition that specific allegations of falsity in a false swearing indictment are surplusage, they are inconsistent with this circuit's case law interpreting *Stirone. See United States v. Slawik, supra.* We are convinced that our constructive amendment analysis of the *Stirone* holding is correct. Applying the *Stirone* principle to this case, we are compelled to hold that when a grand jury has specifically charged the manner in which testimony is untruthful, permitting the government to prove that it is untruthful in an entirely different manner amounts to a constructive amendment of the indictment rather than a mere variance. The perjury context is an a fortiori case for the application of the *Stirone* principle, when compared with the Hobbs Act with which the *Stirone* Court was concerned, for materiality and falsity are separate elements of the §§ 1621 and 1623 offenses. There is no way that we can determine whether the grand jury thought the unresponsive testimony relied upon by the trial court was material or false in any respect other than as a reference to Groce. As we observed in *Slawik,* a perjury indictment must

> set forth the precise falsehood alleged and the factual basis of its falsity with sufficient clarity to permit a jury to determine its verity and to allow meaningful judicial review of the materiality of those falsehoods.

548 F.2d at 83. Here the grand jury did so, but the trial court permitted a constructive amendment so as effectively to charge an entirely different factual basis for falsity. This error requires a new trial on Count I.

## IV. CONCLUSION

We find no merit in the appellant's other two contentions—i. e., that his sixth amendment right of confrontation was violated by the order precluding use of the tape and that there was insufficient evidence to sup-

---

**9.** The *Stirone* Court stated:

It follows that when only one particular kind of commerce is charged to have been burdened a conviction must rest on that charge and not another, even though it be assumed

that under an indictment drawn in general terms a conviction might rest upon a showing that commerce of one kind or another had been burdened.

361 U.S. at 218, 80 S.Ct. at 274.

port the conviction. But because of our holding with regard to the constructive amendment of the indictment, the judgment appealed from will be reversed and the case remanded to the district court for a new trial on Count I of the indictment.