

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-20-2003

# USA v. Whitaker

Precedential or Non-Precedential: Non-Precedential

Docket 02-1685

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"USA v. Whitaker" (2003). *2003 Decisions.* Paper 549.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/549

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT  PRECEDENTIAL

THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 02-1685
_____

UNITED STATES OF AMERICA,
vs.
WAYNE WHITTAKER,
Appellant.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(D.C. No. 01-cr-00107)
District Judge:  The Honorable Stewart Dalzell

_____

ARGUED JANUARY 22, 2003

BEFORE:  BECKER, <u>Chief</u> <u>Judge</u>, NYGAARD and AMBRO, <u>Circuit</u> <u>Judges</u>.

(Filed:  May 20, 2003 )
_____

Samuel C. Stretton, Esq. (Argued)
301 South High Street
P. O. Box 3231
West Chester, PA 19381-3231
          <u>Counsel for Appellant</u>

Mark S. Miller, Esq. (Argued)
Office of United States Attorney
615 Chestnut Street
Philadelphia, PA 19106
          <u>Counsel for Appellee</u>

_____

OPINION OF THE COURT
_____

NYGAARD, <u>Circuit</u> <u>Judge</u>.

In this case, Appellant Wayne Whittaker claimed that his car was stolen without his knowledge or consent. The FBI presented evidence that he had taken part in an "insurance give-up" scheme. We are required to determine whether the evidence used to convict Whittaker of mail fraud is sufficient. Whittaker makes two arguments. First, he contends that the District Court violated the corpus delicti rule by allowing the Government to use several statements that he made to the FBI. Second, he asserts that the District Court erred by not granting a judgment of acquittal because the evidence was insufficient to support the verdict. After analyzing the relevant case law and scouring the record, we reject both arguments, and affirm.

I.

A rash of automobile thefts in Philadelphia in the early 1990s prompted the FBI to set up a stolen car task force. The task force uncovered a secret location in the city where a theft ring maintained a "chop shop" known as the "Hacienda." A chop shop is a place where stolen cars are disassembled and sold, piece-by-piece, to often complicit repair and body shops. Like social security numbers, every vehicle has a different vehicle identification number ("VIN"), which is affixed to various parts of the vehicle. Once

2

separated from the chassis, the vehicle parts do not carry VINs, or their VINs are removed, so the parts can no longer be identified.

An FBI informant working in the Hacienda gave the FBI information about the car thefts that passed through the chop shop, including "insurance give-ups." An insurance give-up is a vehicle that is turned in to the chop shop by or on behalf of someone trying to collect insurance money by reporting the vehicle stolen. Both parties benefit from this scheme: the vehicle owner gets insurance money and out of any lease payments, and the car thief gets a car.

Appellant's 1998 Jeep Cherokee, identified by its VIN plates, was delivered to the chop shop. At the time of its arrival, there was evidence that the car was an insurance give-up: testimony showed that there was no damage to the steering column, door locks, or windows, and that the key was in the ignition.

During a subsequent interview with the FBI about the car theft, Whittaker admitted that he had participated in two phone conversations with an individual who offered to "get rid of" his vehicle as an insurance give-up. Whittaker told the FBI that, during the second phone call, he informed the caller that he was not sure he wanted to go through with the scheme. He did not tell the man not to take his car.

The Government prosecuted Whittaker, and a jury found him guilty of one count of mail fraud, 18 U.S.C. § 1341. Whittaker moved for a judgment of acquittal, but the District Court denied the motion. Whittaker's motion for reconsideration was also

3

denied and he was sentenced to five years probation, six months of home detention, and restitution of $26,543. He timely filed a notice of appeal. The District Court had jurisdiction of the violation of 18 U.S.C. § 1341 under 18 U.S.C. § 3231, and we have jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

## II.

Because the District Court's decision regarding the admissibility of Appellant's statements following an objection on corpus delicti grounds is one of law, our review is plenary. *United States v. Serafini*, 233 F.3d 758, 768 n.14 (3d Cir. 2000).

## A.

The Supreme Court has held that in order to sustain a conviction based upon a confession or admission on the part of the defendant, the statement of the defendant must be corroborated by some evidence of the corpus delicti ("the body of the offense" or the "essence of the crime"). *Opper v. United States*, 348 U.S. 84, 93 (1954).[1] The purpose of the corpus delicti doctrine is to prevent convictions of criminal defendants based solely upon untrue confessions. *Warzower v. United States*, 312 U.S. 342, 347 (1941). According to the corpus delicti "trustworthiness" principle, confessions and

---

1. Although the discussion of the corpus delicti doctrine pertains to the admissibility of evidence, not the sufficiency of evidence to convict, *Government of the Virgin Islands v. Harris*, 938 F.2d 401, 409 (3d Cir. 1991), our analysis of both the corpus delicti doctrine and the legal sufficiency of the evidence necessarily overlap. *See, e.g., United States ex rel. Hayward v. Johnson*, 508 F.2d 322, 330 (3d Cir. 1975) (holding that several pieces of circumstantial evidence "both satisfy the corpus delicti rule and provide sufficient evidence for the jury . . . .").

admissions must be corroborated by "substantial independent evidence which would tend to establish the trustworthiness of the statement." *Id.*; *United States v. Wilson*, 436 F.2d 122, 123 (3d Cir. 1971).

In a corpus delicti analysis, sufficient evidence establishing the trustworthiness of the statements at issue is the critical consideration. *Government of the Virgin Islands v. Harris*, 938 F.2d 401, 408 (3d Cir. 1991). In order to establish corpus delicti, the Government need prove only that a crime has been committed; identifying the defendant as the perpetrator of the crime is not required. *Id.* Finally, the confession can prove itself trustworthy if it discloses facts that were unknown to anyone other than the criminal. *Id.* at 403; *Wilson*, 436 F.2d at 123.[2]

B.

The admissions at issue took place with FBI Special Agent Jennifer Usleber. When Usleber confronted Whittaker with evidence of an insurance give-up, he seemed "visibly nervous." App. 406. He then admitted that an unknown caller called him and said, "I understand you have something you want to get rid of." App. 409. When he asked the caller to clarify, the caller said, "your vehicle," and then, "We can make it disappear." App. 410. Whittaker admitted that he listened to the caller's proposition, and provided the caller with details about his car: the make, model, color,

---

2.       The requirement that the corpus delicti be established by evidence independent of a confession is different from the requirement that there be independent evidence establishing the truthfulness of the confession.

license number, and where it would be parked. App. 411-12. After Whittaker asked the caller what more he needed to do, the caller replied, "Nothing." App. 412. In response to Usleber's asking Whittaker what he thought would happen after this call, Whittaker said that he figured his car would be taken, and that he would be able to get out from under the lease. App. 412. Whittaker also described a second phone call during which he told the caller he had second thoughts. App. 415. But he admitted to Usleber that he did not tell the man not to take his car, and he did not do anything, such as park his car in a different location, that would have prevented it from being stolen. *Id*.

C.

Whittaker asserts that his conviction is based on this confession to the FBI agent, and that these statements are not corroborated by substantial independent evidence which would tend to establish the trustworthiness of the confession. This argument fails, for we conclude that there is sufficient evidence to establish the trustworthiness of Appellant's statements to the FBI.

William Stauffer, the informant working in the Hacienda, testified that when he first entered Whittaker's black Jeep Cherokee, the keys were in the ignition and there was no damage to the steering column, doors, or windows. App. 219-21. Frank Ozga, the operator of the Hacienda, also testified that he was provided with keys to the Jeep, and that there was no damage to the steering column, doors, or windows. App. 148. Whittaker testified that he not only locked the car, but that he also used The Club™ to

6

lock the steering wheel, and activated the car alarm. A jury could have believed the testimony of Stauffer and Ozga, and disbelieved Whittaker's testimony that he left his Jeep, locked, alarmed, and Clubbed, and that he was the only person who had keys to it. App. 298, 310, 327.

Whittaker told Police Officer Rivera, who took the initial stolen vehicle report, that he left his Jeep parked on the street on a Friday, and returned Sunday night to find it stolen. Ozga testified that he would instruct the person surrendering the vehicle not to report the vehicle stolen for "three days to a week" to give him time. App. 91-92. A jury could have drawn an inference from Whittaker's three-day trip that this instruction had been communicated to him.

When Officer Rivera took the initial report from Whittaker, Whittaker told him that there were no financial arrearages on the vehicle. App. 299. Not only were there financial arrearages on the Jeep Cherokee, but Whittaker was especially anxious about those arrearages. According to a Collection Department Supervisor at World Omni Financial Corporation ("the leasing company"), in April and May, after a World Omni customer account representative told Whittaker that he was significantly behind on his payments, the representative had discussions with Whittaker about the options of his voluntary surrender of the Jeep or the refinancing of the vehicle. App. 389. Whittaker was told that, had he elected to surrender his vehicle voluntarily to World Omni, the leasing company would take possession of the vehicle, sell it at auction, and pursue

7

Whittaker for any outstanding balance still owing.[3] Because of an accident that Whittaker had been in four days before the Jeep was reported stolen, which required repairs of an estimated $1,300, App. 349, this outstanding balance would have been even greater. Whittaker testified he was not making his payments at the time because he "didn't have the money." App. 562. In addition, Whittaker was told by World Omni that a voluntary surrender of the Jeep would have a negative effect on his credit file. App. 614. We conclude that a jury could have inferred an insurance give-up motive from Whittaker's automotive financial dire straits. A jury could have also decided that Whittaker lied to the police officer about his arrearages in order to cover up his crime.

Other important circumstantial evidence against Whittaker includes testimony by Ozga that he was contacted by Leonard DeWolfson, Sr. (for whom Ozga had done "insurance jobs" in the past), who said that he had a black Jeep Cherokee insurance job which he wanted to pass to the Hacienda. App. 93-94.[4] Also, Michael Dyke, who is Ozga's stepson and who worked for Ozga in the Hacienda, corroborated Ozga's testimony that the Jeep was an "insurance job" and that the DeWolfsons provided the keys with the car. App. 175-76.

---

3.      Whittaker testified at trial that World Omni wanted to charge him $29,000 for his Jeep Cherokee, which only had a book value of between $19,000 and $21,000. App. 557.

4.      This testimony was enhanced by Ozga's details, such as that he "negotiated" with DeWolfson, that DeWolfson's son dropped off the Jeep, and that he had paid the DeWolfsons $300. App. 95-96.

8

Whittaker argues that because one would have to drive around for "forty or more minutes" looking for a parking spot in his Philadelphia neighborhood, it would never be possible to tell anyone with any certainty where he would park his car with regularity. App. 564. This argument overstates the car thief's task: the thief could easily cover the neighborhood looking for a particular car in a matter of minutes.

Finally, the nature of Whittaker's statements doom his argument. If the confession itself discloses facts that were unknown to anyone other than the criminal, the confession can prove itself trustworthy. *Harris*, 938 F.2d at 403. In *Harris*, an appeal from a conviction for first-degree murder where no body was recovered, the defendant argued that the evidence obtained independent of his confession did not satisfy the trustworthiness doctrine. *Id*. In affirming the conviction, we held that as long as the evidence was substantial and proved trustworthy, the doctrine was satisfied. *Id*. at 410. We stated that this could be done in any number of ways, most notably by the detailed confession itself, if it demonstrated knowledge unknown to anyone other than the criminal. *Id*. In affirming the conviction, we held as sufficient evidence that the victim and the defendant had displayed acts of violence toward each other and that the victim had sought to avoid the defendant for fear of her life. *Id*. at 417-18. Essentially, we held that even in homicide cases, where no body or murder weapon has been recovered, a defendant's statements concerning how the killing was carried out, corroborated by circumstantial evidence that there was a homicide, support the admissibility of those

statements. In this case, Whittaker's statements about this contact with the car thief disclosed the way in which the insurance give-up scheme operates: the individual who wants an insurance job is contacted, and asked for a description of the car, the license plate number, and where it would be parked. Therefore, Appellant's statements about his contact with a man who identified himself as a car thief for "insurance jobs," corroborated by circumstantial evidence that there was an insurance job, support the admissibility of those statements.

In sum, because the record evidence is sufficient to establish the trustworthiness of Whittaker's statements and satisfy the requirements of the corpus delicti doctrine, the statements are admissible.

III.

When reviewing a district court's decision regarding sufficiency of the evidence, we apply "a particularly deferential standard of review when deciding whether a jury verdict rests on legally sufficient evidence. . . . [W]e must view the evidence in the light most favorable to the government, and will sustain the verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Dent*, 149 F.3d 180, 187 (3d Cir. 1998) (citations omitted). After scouring the record, we conclude that there was more than sufficient evidence that Whittaker gave up his Jeep Cherokee as part of an insurance fraud scheme.

10

To convict Whittaker of mail fraud, the Government had to establish (1) his knowing and willful participation in a scheme to defraud, (2) with the specific intent to defraud, and (3) the use of the mail or interstate wire communications in furtherance of the scheme. *United States v. Antico*, 275 F.3d 245, 261 (3d Cir. 2001).

Whittaker's admission to the FBI, described above, is quite condemning. Further, the jury could choose to believe that his story to the FBI was not the entire truth: that he had more than two conversations with the caller, or that the telephone calls were different than the way he described them. The jury could have determined that Whittaker told Usleber about the two calls because he realized that the FBI might have phone records. *See United States v. Voigt*, 89 F.3d 1050, 1090-91 (3d Cir. 1996) (stressing that the jury may reject the defendant's proffered interpretation and accept the government's, and that we draw all reasonable inferences in favor of the jury's verdict).

Whittaker testified that he never told any friends, family members, or the insurance company about the calls. App. 580-81. The calls "didn't stick into [his] mind," and after his Jeep was stolen, the calls "didn't really pop into [his] mind" until a month later. *Id*.

Whittaker asserts that because of a discrepancy between the date of the mailing in the indictment and the evidence presented at trial concerning the actual date of mailing, the government "failed to prove what it alleged in the complaint." This argument is meritless because time is not an essential element of mail fraud, and proof of

11

the acts charged, before the indictment and within the statute of limitations, is normally sufficient. *United States v. Somers*, 496 F.2d 723, 745 (3d Cir. 1974). This variance did not deprive Whittaker of due process because he was sufficiently apprised of the charge against him such that he was not prevented from mounting a stronger or different defense. *See United States v. Crocker*, 568 F.2d 1049, 1059 (3d Cir. 1977).

We conclude that the Government's evidence is sufficient for a conviction, and that the jury did not base its verdict on mere speculation. Whittaker's admissions concerning the telephone conversations are incriminating; the jury's conclusion that the disappearance of his Jeep flowed from the conversations does not rest merely upon conjecture. Whittaker's financial motivation and his attempts to escape the lease in talks with World Omni provide motive. Finally, evidence shows that the undamaged Jeep arrived at the Hacienda with the key.

IV.

For the reasons discussed, we will affirm the District Court.

Becker, *Circuit Judge*, dissenting.

The Government is to be congratulated on its successful prosecution of the operators of the "chop shop" known as the "Hacienda." Similar kudos are not warranted with respect to the Government's prosecution of Mr. Whittaker. To be sure, the evidence is clear that Whittaker was in arrears on his lease payments, and would have taken a financial "bath" had the vehicle simply been repossessed; hence he stood to gain by an "insurance give up." Yet mere motive can never be enough to establish guilt, especially in a case such as this one. Rather, there needs to be evidence in the record from which the factfinder could reasonably conclude that there was some complicity between Whittaker and the chop shop operators, or the thief who took the Jeep to the Hacienda. But there is none.

The Government relies heavily on the fact that Whittaker admitted to an investigating officer that, in response to an inquiry from an anonymous telephone caller who likely had access to Whittaker's lease payment record, he gave the caller certain information that might suggest complicity. But there is nothing in the record to suggest that Whittaker was lying when he told the same officer that during a second call from the anonymous man, he got "cold feet," and did not agree to a "give-up." In his trial testimony, Whittaker denied complicity, and adduced evidence that the Jeep was locked and "clubbed," and parked at different locations in Queen Village, where we can

13

judicially notice that parking is "hen's teeth" scarce. Queen Village is a large neighborhood, and I have no idea where the majority gets the notion that the thieves could scour the area in a matter of minutes; Whittaker testified that it could take 30-45 minutes to find parking, which seems correct to this writer.

I acknowledge that Whittaker's statements during the investigation were not entirely consistent. But they do not, in my view, establish such consciousness of guilt as to save the Government's case. Whittaker had no reason to believe that he was a suspect, and the investigation of him was at a nascent stage, and misstatement at that juncture was not criminal.

The linchpin of the Government's case is the car keys. The Government contends that the jury properly inferred complicity from testimony demonstrating that the chop shop had keys to Whittaker's Jeep and that the Jeep was received at the chop shop in an undamaged condition. These facts are certainly suspicious and may suggest that the Jeep was a "give up." But there is no evidence that the chop shop got the keys from or through Whittaker. Indeed, he testified that he threw them away when he found out that the Jeep had been stolen. I do not believe that a reasonable jury could infer that Whittaker had turned over his keys to the thieves simply from the fact that the chop shop possessed the keys. For example, a copy of the keys could have been made using a mold of the lock. In short, the government was not able to link Whittaker's actions to the fact that the chop shop had the keys. Moreover, there was evidence in the record that a

14

"virtuoso" car thief could steal even a locked vehicle without damaging it.[5]

There is certainly suspicion that Whittaker was involved. There might even be enough to convict him if the standard of proof were a fair preponderance of the evidence. But the Government has prosecuted Whittaker for a crime, and the standard is proof beyond a reasonable doubt. On the evidence that I have described, that standard is simply not met. In my view, the conviction should be set aside, hence I respectfully dissent.[6]

---

5.    I note that the majority states that:

> Other important circumstantial evidence against Appellant includes testimony by Ozga that he was contacted by Leonard DeWolfson, Sr., for whom Ozga had done "insurance jobs" in the past, who said that he had a black Jeep Cherokee insurance job of which he wanted to dispose. Also, Michael Dyke, who is Ozga's stepson and who worked for Ozga in the Hacienda, corroborated Ozga's testimony that the Jeep was an "insurance job" and that the DeWolfsons provided the keys with the car.

I fail to see how this "important circumstantial evidence" helps establish the necessary linkage that DeWolfson was the car thief, since there is no indication that DeWolfson had personal contact with Whittaker. There is no evidence as to how DeWolfson got the keys and Dyke's "corroboration" is purely conclusory and lacks evidentiary support.

6.    I need not address the corpus delicti issue since I would reverse the conviction based on the fact that there was insufficient evidence to sustain a conviction. However, I do believe that the majority conflates the discussion of corpus delicti with the discussion of legal sufficiency.

15

_____

TO THE CLERK:

Please file the foregoing opinion.



/s/ Richard L. Nygaard

Circuit Judge