**UNITED STATES of America,
Appellant,**

v.

**Richard FINUCAN and Dee Rocca,
Defendants, Appellees.**

No. 82–1506.

United States Court of Appeals,
First Circuit.

Argued March 7, 1983.

Decided May 26, 1983.

Robert J. Lynn, First Asst. U.S. Atty., Concord, N.H., with whom W. Stephen Thayer, III, U.S. Atty., Concord, N.H., was on brief, for appellant.

R. David DePuy, Manchester, N.H., and Wilbur A. Glahn, III, Concord, N.H., by appointment of the Court, with whom Alice C. Briggs, and McLane, Graf, Raulerson & Middleton Professional Association, Manchester, N.H., were on brief, for Dee Rocca.

Before CAMPBELL and BOWNES, Circuit Judges, and CAFFREY,* District Judge.

LEVIN H. CAMPBELL, Chief Judge.

Appellee Dee Rocca and codefendant Richard Finucan were charged with conspiracy to commit mail fraud in violation of 18 U.S.C. §§ 371, 1341 and 1343, in connection with a motor vehicle odometer "rollback" scheme, and with seven counts of violating section 404 of the Motor Vehicle Information and Cost Savings Act of 1972, 15 U.S.C. § 1984, in connection with the same scheme. Rocca was also charged with three counts of perjury in violation of 18 U.S.C. § 1623. In pretrial motions she moved to suppress all evidence obtained during an illegal search of her house as well as all evidence obtained by the government after the search. She also moved to dismiss the perjury charges. The district court granted the suppression motion and dismissed two of the three counts of perjury. The United States then brought this interlocutory appeal pursuant to 18 U.S.C. § 3731.

## I. SUPPRESSION ORDER

### A. The Investigation

Before considering the government's challenges to the suppression order, we shall describe the investigation that led to the indictments. Rocca was a bookkeeper at Auto Alley, a used car dealership run by Richard Finucan, Walter Harlan and Ralph Alley. According to evidence presented at the suppression hearing, Elzear Houle of the Consumer Protection Division of the New Hampshire Attorney General's Office began investigating Auto Alley in late 1978 or early 1979 for possible odometer tampering. Houle started his investigation by checking the records of the Concord Auto Auction for cars sold through the Auction by Auto Alley. After obtaining the vehicle identification number (VIN) of such cars, he ran the numbers through the computers of the motor vehicle departments of several New England states. This search enabled Houle to learn the name of the last titled owner of the car. Houle then contacted that individual and asked for the name of the dealer to whom the car was sold. That dealer was then questioned about that specific car and all other cars he sold to Auto Alley. Houle also obtained from the dealer copies of all pertinent documents relating to

* Of the District of Massachusetts, sitting by designation.

such cars. Houle then went back to the Concord Auto Auction to ascertain the disposition of the other cars sold by the dealer to Auto Alley.

From this process Houle discovered that many cars which had been acquired by Auto Alley were later resold through the Concord Auto Auction by three Vermont dealerships ostensibly run by Bertrand Dupuis, a/k/a Joseph Dupuis. When the Vermont dealers resold them, the cars showed significantly less mileage than when first sold to Auto Alley. Evidence also suggested that many of the cars had been given false Maine registrations.

On January 9, 1980 Houle and other state law enforcement officials executed a state search warrant, now conceded to be invalid, at Rocca's residence. Twelve to fourteen boxes of documents were seized, along with a ledger book and two Maine "true copy" stamps that could have been used to forge Maine registrations.[1] The search warrant materials were taken to the New Hampshire Attorney General's office and reviewed over the course of four months. According to Houle, he initialed the backs of the seized documents and then sorted them into files arranged by VINs.

Federal officials joined the investigation in the spring of 1980. Postal Inspector Gary Kinney then accompanied Houle to further interviews with dealers at which they obtained additional documents. Houle testified that at this point in the investigation he and Kinney basically only obtained originals of documents he already had from lawful sources. Kinney testified that he and Houle based their questioning of the dealers in part on their files which contained the illegally seized documents.

On August 5, 1981 most of the materials seized on January 9, 1980, under the invalid warrant were turned over to John Boeckler, the attorney for Ralph Alley. Ralph Alley was then facing state criminal charges, and this transfer was authorized by the state court and consented to, in writing, by Rocca.[2] Alley subsequently pled guilty to federal charges and, as part of the plea agreement, turned these documents over to the United States Attorney's office.

After she was indicted in the present case, Rocca moved to suppress both the evidence seized at her house on January 9, 1980 and that obtained later by government agents. The government conceded that the search warrant was invalid and that there was no formal justification for the January 9 search. Still, the government resisted suppression, contending that evidence seized under the invalid warrant had come back to governmental custody through lawful means, and that documents obtained after January 9, 1980 had been obtained independently of the illegal seizure. The government also defended on the ground the investigators had relied in good faith on the defective warrant. And finally, even assuming the evidence was suppressible as to the conspiracy and odometer tampering charges, the government thought it should be admissible as to the perjury counts. Agreeing with Rocca, the district court ordered the suppression of all of the materials acquired by the government both on and after January 9, 1980.

In the following discussion, we deal first with the documents illegally seized at Rocca's house on January 9, and secondly with those later acquired.

### B. *Materials Seized in the Course of the Illegal Search on January 9, 1980*

■ In arguing against suppression of the materials unlawfully seized at Rocca's house on January 9, 1980, the government relies primarily upon our opinions in the related cases of *Lord v. Kelley,* 334 F.2d 742

---

1. The stamps bore the notation "TRUE COPY FROM MAINE MOTOR VEHICLE RECORDS."

2. After federal officials entered the investigation, the Assistant United States Attorney concluded that the search warrant was invalid for lack of probable cause and specificity. Houle then attempted to purge his files of the search warrant materials. This attempt was not completely successful, as he later discovered that he had overlooked at least two documents seized at Dee Rocca's house. These two documents and the Maine "true copy" stamps were not turned over to Boeckler.

(1st Cir.1964), *cert. denied,* 379 U.S. 961, 85 S.Ct. 650, 13 L.Ed.2d 556 (1965); *McGarry's, Inc. v. Rose,* 344 F.2d 416 (1st Cir.1965), and *McGarry v. United States,* 388 F.2d 862 (1st Cir.1967), *cert. denied,* 394 U.S. 921, 89 S.Ct. 1178, 22 L.Ed.2d 455 (1969). In those cases, an IRS agent had signed an administrative summons ordering an accountant, Lord, to hand over some of his clients' tax records. Without serving the summons or obtaining any judicial authorization, the agent went to Lord and coerced him into turning over the records. Lord and his clients, including McGarry, then brought an action for the return of the documents and an order for their suppression in any future proceedings that might be brought. The district court ordered the return of the documents but refused to order their suppression, holding the petitioners had no right to be better off than they would have been had the IRS agent not acted unlawfully. *Lord v. Kelley,* 223 F.Supp. 684 (D.Mass.1963). The petitioners appealed, and we dismissed for lack of appellate jurisdiction. 334 F.2d 742 (1st Cir.1964), *cert. denied,* 379 U.S. 961, 85 S.Ct. 650, 13 L.Ed.2d 556 (1965).

The government then served McGarry with a summons for the documents. He moved to quash it. In an opinion affirming the district court's denial of relief, we noted that the court's original refusal to suppress the documents was based on a finding that the agent knew of the documents' existence and had already drafted a summons for them prior to the illegal seizure. *Id.* at 418. Since the summons had not been sought as a result of the illegal search, there was no reason to immunize the documents against summonsing. 344 F.2d at 419, *citing Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). That holding was reaffirmed when McGarry appealed his criminal conviction on the basis of the admission of the once seized documents. 388 F.2d at 862.

The *McGarry* cases do not dictate reversal of the suppression order here. An im-

portant factor in them was the district court's finding that the IRS knew of the records independently of the illegal search and was in the process of lawfully obtaining the documents at the time of the agent's illegal seizure. The return of the documents thus restored the status quo ante, the ultimate result being no different than had the illegal search never taken place.

Here the record did not require the court to find, and it did not find, that the government would inevitably have come to these records apart from the illegal search. While Houle had unearthed much information, it is not clear he had encountered, or necessarily would have encountered, much of the material found at Rocca's house, including the damning registry stamps and the documents linking Auto Alley to the three Vermont dealers.[3]

Furthermore, unlike the situation in *McGarry,* the government did not regain possession of the documents by a means wholly independent of the illegal activity. The documents eventually came back to the government as the result of Ralph Alley's plea bargain—and this was the product of a criminal prosecution reinforced by the illegally seized evidence. The district court could conclude that the government regained the evidence through exploitation of the fourth amendment violation. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

The government argues that the grand jury could have subpoenaed the same documents originally. But the exclusionary rule is not aborted whenever the government can show that illegally obtained evidence *could* have been lawfully obtained. *See United States v. Allard,* 634 F.2d 1182 (9th Cir.1980). The rule is aimed more at the unlawful conduct than at the lawful availability or unavailability of the evidence. *See United States v. Taheri,* 648 F.2d 598 (9th Cir.1981); 634 F.2d at 1182.

---

**3.** The most important evidence uncovered by the search was documents showing that the cars with tampered odometers were transferred by Auto Alley directly to the straw Vermont

dealers. Proof of this linkage between Auto Alley and the Vermont dealers had been lacking in the government's case prior to the search.

The decision in *McGarry* rested upon the fact that the government not only *could have* summonsed the documents but was *actually* in the process of so doing before the illegal seizure took place. *See United States v. Romero,* 692 F.2d 699 (10th Cir. 1982) (exclusionary rule does not apply where lawful search underway prior to illegal search would have discovered evidence). Thus in *McGarry* the court believed that lawful efforts, begun prior to the illegal seizure, would inevitably have come up with the same documents. *See United States v. Bienvenue,* 632 F.2d 910 (1st Cir.1980). While the government argues that would have happened here also, the lower court was not compelled to agree with that proposition. *See* LaFave, *Search and Seizure* § 11.4 (1978) (inevitable discovery exception to exclusionary rule should only be applied where it is in fact certain that evidence would have been lawfully obtained had it not been for illegal search).

## C. *Evidence Obtained after January 9, 1980*

The district court also ordered suppression of all of the evidence obtained by government agents *after* the illegal search, consisting primarily of documents obtained during interviews with dealers. The government argues that these were obtained independently of the search and, even if not, *could* have been so acquired. The government further claims that even if the district court were correct in suppressing some of the evidence obtained after January 9, 1980, it erred in ordering a blanket suppression of all such evidence. We first consider the former contention and then discuss the sweep of the district court's order.

■ The question whether evidence obtained after an illegal search should be suppressed as the fruit of the poisonous tree depends upon " 'whether, granting establishment of the primary illegality, the evidence to which ... objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary

taint.' " *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 *quoting* Maguire, *Evidence of Guilt* 221 (1959). Such an analysis depends primarily upon weighing the facts in the particular case, LaFave at § 11.4, and is thus a matter especially suitable for resolution by the district court.

■ Here there was record support for a finding that the government impermissibly exploited the illegally seized material in gathering some of the additional evidence. Postal Inspector Kinney testified that he relied upon information obtained from the seized documents in guiding his investigation. He stated that he and Houle may have relied upon the seized documents in deciding whom to interview and what to ask, and that the documents were taken to the interviews. Both Houle and Kinney testified that the seized documents became comingled with the other evidence in the files and were not treated separately during the course of the later investigation. Moreover, Houle stated that it took him four months to review the materials taken from Rocca's house, suggesting that they provided a wealth of information to the government. Given this, there was sufficient basis for the district court to have concluded that some of the evidence acquired after January 9, 1980 was tainted fruit of the poisonous tree.

■ We do not agree with the government that *United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978), precludes suppression of documentary evidence later acquired from the dealer interviews. Stressing our adversary system's preference for live testimony, the Court in *Ceccolini* declined to treat a witness's voluntary testimony as derivative of an illegal search or seizure. 435 U.S. at 277, 98 S.Ct. at 1060. But the question here is not rejection of live testimony but rather suppression of documents obtained from third parties. While the intervening role of third parties should be considered in determining whether documentary evidence was discovered independently of an illegal search or seizure, *id.* at 288, 98 S.Ct. at 1066,

it is but one of the factors to be weighed. *See United States v. Carsello,* 578 F.2d 199, 203 n. 3 (7th Cir.), *cert. denied,* 439 U.S. 979, 99 S.Ct. 565, 58 L.Ed.2d 650 (1978).

Here the district court could have found that this factor was outweighed by other considerations. Absent the illegal search, the investigators might not have known the identity of all of the third parties nor what to ask them. *Compare* 435 U.S. at 279, 98 S.Ct. at 1061. There was some indication, moreover, that the government anticipated that the illegal search would help lead it to the other dealers and documents. *Compare* 435 U.S. at 280, 98 S.Ct. at 1062. Finally, there is no indication the third parties would have come forward on their own had the investigators not sought them out.

Nor can we say the district court erred in not giving effect to the inevitable discovery exception to the exclusionary rule. Prior to the search the government lacked sufficient knowledge about Auto Alley to obtain a valid search warrant. And although much of the information the government obtained after the search was theoretically available in the computers of state motor vehicle departments, Kinney testified that the very problem in the investigation was that many of the titles being searched were mysteriously absent from state data banks. Therefore, the district court could properly have distinguished this case from *United States v. Bienvenue,* 632 F.2d 910 (1st Cir.1980), where we found the government would inevitably have discovered the fact that the defendant had taken trips to Colombia even if there had been no illegal search. In *Bienvenue* the government knew prior to the search that the defendant had booked flights with a Manchester travel agent. It could easily have located the agent and uncovered the evidence. Here the government was looking for information on hundreds of cars, registered in numerous states, each of which passed through several hands. Given the enormous difficulty and expense of uncovering all of this information, plus Kinney's statement that some of the information was found to be missing from state computers, the district court could have found that discovery of some of the documents was far from inevitable.

■ We are troubled, however, by the broad sweep of the district court's order. The record contains uncontradicted testimony that many of the documents obtained after the improper search at Rocca's house were merely originals of documents in the government's possession *prior* to the search. These could not have been the product of the "primary illegality." *Wong Sun,* 371 U.S. at 488, 83 S.Ct. at 417. And there may be other documents as to which the January 9, 1980 search and seizure could have played no part. The district court did not refer to this problem when ruling on the suppression motion. We recognize that it was the government's fault that the untainted documents were comingled with the tainted ones. The court may have seen no practical way to separate the two categories of material. Certainly it was the government's burden to show what particular documents obtained after January 9 were free from the general taint. *See McCormick on Evidence* § 337 (1972). The defendant's initial burden of presenting specific evidence of taint, *United States v. Alderman,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), did not require her to make refined distinctions as to every individual document in the group of records held by the government, nor was the court required to go to inordinate lengths to dig the government out of a hole of its own making. *But see United States v. Choate,* 576 F.2d 165 (9th Cir.) (Hufstedler, J., concurring in part and dissenting in part), *cert. denied,* 439 U.S. 953, 99 S.Ct. 350, 58 L.Ed.2d 344 (1978). Defendant having presented evidence that a "substantial portion" of the records in a group of records were acquired unlawfully, 394 U.S. at 183, 89 S.Ct. at 972, the district court could insist that the government come forward with clear proof of any untainted records.

Arguably the government has failed to meet its burden, thus justifying a blanket suppression order. But there is no reference to this issue in the court's order, and it is not clear that its failure to separate the innocently obtained documents from others

was due to the government's lack of specific guidance concerning which were which. As it seems clear some of the documents were innocently obtained, we remand with directions that the court reopen the suppression proceeding on this single issue, and allow the government to demonstrate, if it can, which documents are clearly separable from those affected by the general taint. If the government, now that its attention is properly focused, cannot clarify matters to the court's satisfaction, the court may reissue its blanket order as to all documents whose untainted character has not been demonstrated. We add that the reopened hearing is not to cover documents of the type we have already agreed may be suppressed, but should be limited simply to salvaging from the suppression order any documents which are clearly not attributable to the illegal search.

### D. *Admission of Suppressed Evidence as to Perjury Charges*

■ The government argues, citing to holdings of three sister circuits, that even if the evidence must be suppressed as to the conspiracy and odometer tampering charge, it should be admissible as to the perjury charges because the alleged perjury occurred after the illegal search and seizure. *See United States v. Paepke,* 550 F.2d 385 (7th Cir.1977); *United States v. Turk,* 526 F.2d 654, 667 (5th Cir.), *cert. denied,* 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976); *United States v. Raftery,* 534 F.2d 854 (9th Cir.), *cert. denied,* 429 U.S. 862, 97 S.Ct. 167, 50 L.Ed.2d 141 (1976); LaFave at § 11.6. *But see United States v. Ceccolini,* 542 F.2d 136 (2d Cir.1976), *rev'd on other grounds,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). We agree with the reasoning of these courts. The government's interest in admitting the evidence in such cases is substantial: if the evidence were suppressed, victims of illegal searches and seizures could commit perjury indiscriminately knowing that the government would be barred from using probative evidence in a subsequent trial. *Cf. Harris v. New York,* 401 U.S. 222, 226, 91 S.Ct. 643, 646, 28 L.Ed.2d 1 (1971) (*Miranda* violation "cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances"). At the same time, the admission of the evidence will ordinarily have little if any impact on the deterrent effect of the exclusionary rule. As the Fifth Circuit stated in *Turk:*

> When the Government is effectively denied the possibility of direct prosecution on the basis of illegally seized evidence, no significant additional deterrent effect could be realized by suppressing the evidence at a trial of the search victim for a crime committed after the illegal search and with the knowledge that the illegal search occurred.

526 F.2d at 667. This is particularly so in cases like the present where, although the illegal search and seizure was carried out by state officials, the perjury counts are being federally prosecuted. We thus hold that the illegally obtained evidence was not suppressible on fourth amendment grounds as to the perjury indictment.

■ But while evidence of this character is not, in the ordinary sense, suppressible at trials for subsequent acts of perjury, there may be ample reason to exclude it at this single trial involving both the perjury counts *and* the conspiracy and motor vehicle counts. The suppression order as to the latter counts would be meaningless if the suppressed evidence could be presented to the same jury as part of the government's perjury case. *Cf. Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (limiting instructions do not cure sixth amendment violation where defendant cannot cross-examine as to statement of codefendant admitted only against the codefendant). The illegally acquired evidence here was vast in quantity and highly probative of the conspiracy and motor vehicle charges. An instruction would insufficiently remove the prejudice. Under such circumstances, while the material is technically not "suppressible" as to the perjury counts, it is excludable from the trial as a

whole.[4] We thus affirm the "suppression" order relative to the perjury counts insofar as it is taken to be an advance ruling forbidding use of the evidence at a single trial involving the conspiracy and motor vehicle counts. Were the government to request a severed trial and the district court to grant it, or were the government to proceed only on the perjury counts, there would cease to be any proper reason to withhold this evidence. We hold only that the district court did not abuse its discretion in barring the admission of the evidence from a proceeding trying both the perjury and the other counts.

### E. *Good Faith*

The government's final argument as to suppression is that the exclusionary rule should not be applied here because the investigators were acting in good faith in searching Rocca's house pursuant to a state warrant. The existence of a so-called good faith exception to the exclusionary rule is currently under consideration by the Supreme Court. *Illinois v. Gates,* 51 U.S.L.W. 3021 (Aug. 25, 1981) (No. 81–430), *reargued,* 51 U.S.L.W. 3648 (Mar. 1, 1983). It would obviously be inappropriate for us to consider creating any such exception on our own under the circumstances.

### II. PERJURY COUNTS

Rocca was indicted on three counts of perjury. Counts IX and X charge her with giving false testimony before the grand jury investigating Auto Alley. Count XI charges her with giving false testimony in a suppression hearing in the criminal case of Ralph Alley. The district court, finding

that the testimony was not material, and was not literally false under the terms of *Bronston v. United States,* 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973), dismissed counts X and XI. We affirm as to count X but reverse as to count XI.

### A. *Count X*

Count X of the indictment charges Rocca with giving false testimony before the grand jury because she knew "that the 'State of Maine True Copy' stamps belonged to Walter Harlan and that said stamps as well as the Maine microfilm records were used by Auto Alley to create fictitious Maine registrations for motor vehicles the odometers of which had been reset and altered." The infirmities with this indictment are readily apparent by comparing the charge with the allegedly perjurious testimony cited in the indictment.[5] While Rocca's testimony was evasive and unresponsive, she never stated that the Maine true copy stamps did not belong to Walter Harlan. Indeed she was not asked if the stamps belonged to him or whether she knew whose they were. The questions that were potentially most relevant to the issues charged in the indictment were, "Who is they, the people who you are talking about, the people who are doing it?" and "What caused you to believe it was Walter Harlan's stuff?" The former question referred, however, not to ownership of the stamps but to their use. Rocca cannot be charged for lying about her knowledge concerning who the stamps belonged to merely by responding to a question about her knowledge of the stamps' use.[6] *See*

---

4. It is true that when illegally seized evidence becomes admissible for the limited purpose of impeachment, it is allowed to reach the jury, creating a similar danger of prejudice. *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). But, in such circumstances the defendant, not the government, can control whether the evidence is admissible simply by limiting the scope of the defense. The defendant is not free to present false testimony before the jury knowing that the government cannot respond because of the exclusionary rule. Here, there is no similar danger that the perjurious testimony will mislead the trier of fact,

because the alleged perjury was committed prior to the trial. Furthermore, the integrity of the earlier proceeding, at which the perjury was allegedly committed, can be preserved by the government's moving for a separate trial for the perjury charges.

5. Count X of the indictment is set out in Appendix 1.

6. Rocca did suggest in her testimony that she told Alley she did not know who owned the stamps. Lying to Alley, however, does not constitute perjury.

*United States v. Tonelli,* 577 F.2d 194 (3d Cir.1978); *United States v. Williams,* 536 F.2d 1202 (7th Cir.1976).

The question as to why Rocca believed it was "Walter Harlan's stuff" led to nothing more significant. Portions of the testimony deleted from the indictment suggest that "stuff" most likely referred to forged registrations, not the stamps.[7] But even assuming the jury could decide that "stuff" referred to the stamps, *see United States v. Kehoe,* 562 F.2d 65 (1st Cir.1977), the fact remains that the clear language of the question did not ask Rocca about her knowledge of the ownership of the stamps but as to the cause of her belief. The charge that she knew who owned the stamps and lied about her knowledge cannot, of course, be sustained by the fact that she said she did not know why she knew it was Harlan's "stuff." As the Third Circuit has said, in order for a charge of perjury to be sustained, the "true" paragraph must "track" the false testimony. 577 F.2d at 199. That test is obviously not met here.

That the grand jury may have meant to ask Rocca about the ownership of the stamps and her knowledge of that is no cure. In *Bronston v. United States,* 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973), the Supreme Court stated,

> It is the responsibility of the lawyer to probe; testimonial interrogation, and cross-examination in particular, is a prying, pressing form of inquiry. If a witness evades, it is the lawyer's responsibility to recognize the evasion and to bring the witness back to the mark, to flush out the whole truth with the tools of adversary examination.

*Id.* at 358–59, 93 S.Ct. at 599–600.

Count X of the indictment is no less deficient as to its second charge—that Rocca testified falsely because she knew that the stamps and microfilms were used by Auto Alley "to create fictitious Maine registrations for motor vehicles the odometers of which had been reset and altered." Rocca, however, never denied that the stamps and microfilms were used to create fictitious registrations. She merely never mentioned that the fictitious registrations were for cars with tampered odometers. When asked why "they" used the microfilm, she replied:

> I just assumed it was to save a trip for the drivers. Then again, that's my assumption again. It would save drivers money. You know, you have to pay $35 for a driver to go up and get a copy of the registration.

When she was then asked "Would it surprise you to learn that they sold cars—?" she did not deny that she knew that cars were being sold with tampered odometers, but merely stated: "Yes, you told me that before."

The government argues that from this testimony one can imply a denial of the fact that the microfilms were being used to falsify cars with tampered odometers. This might indeed be a fair implication of the testimony, but as the Supreme Court stated in *Bronston,* "we are not dealing with casual conversation. And the statute does not make it a criminal act for a witness to willfully state any material matter that *implies* any material matter that he does not believe to be true." 409 U.S. at 357–58, 93 S.Ct. at 599. Where the government cannot prove that the defendant's testimony, although incomplete and evasive, was not actually a false response to the question

---

7. The deleted portions of the testimony contain the following:

Q. There wasn't a microfilm machine at Auto Alley?
A. No.

. . . . .

Q. How often would you see Maine true copy registrations go across your desk?
A. I couldn't tell. Quite often.
Q. Were they produced with any—did you ever come across a situation where you said,

"Hey, we don't have a title for this, a Maine title." And then in a somewhat rapid-fire way you had a Maine title?
A. Maine registration, no.
Q. Nothing that would cause you any suspicion.
A. No, I am trying to think. Well, maybe; I don't know. In a day or two, but that's normal.

posed, the district court does not err in dismissing the indictment.

■■■ The government argues that *Bronston* does not apply here because the questions asked of Rocca were ambiguous. It is true that where an answer may or may not be false depending upon possible interpretations of an ambiguous question, it is for the jury to decide whether the defendant has committed perjury. *United States v. Kehoe*, 562 F.2d 65 (1st Cir.1977). *See also United States v. Bell*, 623 F.2d 1132 (5th Cir.1980); *United States v. Cuesta*, 597 F.2d 903 (5th Cir.1979), *cert. denied*, 444 U.S. 964, 100 S.Ct. 452, 62 L.Ed.2d 377 (1980); *United States v. Matthews*, 589 F.2d 442 (9th Cir.1978), *cert. denied*, 440 U.S. 972, 99 S.Ct. 1538, 59 L.Ed.2d 790 (1979). In such a case there is an actual possibility that the defendant intended to and did in fact give a response that was literally false. But where, as here, the government hinges its charge on the false implications of a statement that is not alleged to be false in itself, we think that *Bronston* applies and warrants the dismissal of the indictment.

### B. *Count XI*

We can find no similar faults with Count XI.[8] In the suppression hearing Rocca was asked to tell the circumstances in which she became familiar with the stamps. She replied, "They were found in the garage at 170 Valley Street in the back of the garage in boxes." She also stated that she then showed the stamps to Mr. Alley and "he had never seen them before." The government charged that this testimony was false because she had seen the stamps and knew that Mr. Alley had seen them prior to the incidents described in her testimony. If this charge is proven true, Rocca's statements would indeed be false and might constitute perjury, should the other elements of the crime also be met.

■■■ Rocca argues, however, that her statements cannot be perjurious because they were not material to the proceeding.

8. Count XI is set out in Appendix 2.

It is undisputed that a statement must be material to a proceeding in order to constitute perjury within the meaning of 18 U.S.C. § 1623. The test for materiality, however, is a broad one—"whether the false testimony was capable of influencing the tribunal on the issue before it." *United States v. Giarratano*, 622 F.2d 153, 156 (5th Cir.1980). *See also United States v. Berardi*, 629 F.2d 723 (2d Cir.1980), *cert. denied*, 449 U.S. 995, 101 S.Ct. 534, 66 L.Ed.2d 293 (1980). Given this broad test, we find that the district court erred in dismissing the count.

■■ The issue before the court in Alley's suppression hearing was whether or not he had a sufficient expectation of privacy in the evidence to invoke the exclusionary rule. That being the case, the question whether Rocca and he knew about the stamps and microfilm were clearly relevant to the establishment of his interest in the items. Her responses, suggesting that Alley did not have a great deal of interest in the stamps, made it less likely that they were his personal property to which he might have had a reasonable expectation of privacy warranting the protection of the exclusionary rule. That her evidence on this point might not have been dispositive of the issue before the court is immaterial, as long as the statements have some potential for misleading the tribunal; the element of materiality is satisfied and the indictment should not have been dismissed. We accordingly reverse the district court's dismissal of Count XI.

*Affirmed in part; vacated in part; reversed in part, and remanded for proceedings not inconsistent herewith.*

## APPENDIX 1

### COUNT X

1. The allegations of paragraphs 1 through 3 of Count IX are hereby realleged and incorporated herein by reference.

2. At the time and place specified as aforesaid, DEE ROCCA, while under oath,

did knowingly declare before said grand jury with respect to the aforesaid material matter, as follows:

Q. After you left Alley—Auto Alley—were really working with Harlan and Ralph Alley; Did it come to your attention that there were microfilms and blank titles?

A. Blank registrations.

Q. Blank registrations?

A. Yes.

Q. Explain that.

A. Okay. We were cleaning up in the back room. We had—Mr. Asher had purchased an office that he rented from Auto Alley. He had some files in the garage and everybody's files were in the garage from when Dick and Ralph were partners. They had liquidated everything and taken everything out of the office and put them in cardboard boxes and put them in the garage and in this file cabinet and there were metal file cabinets.

One day when we were cleaning up, Mr. Asher came in and he found some stamps, a motor vehicle stamp is what it was when we checked it out and a folder of papers and everything. And they started—this is before we moved. We hadn't moved yet. It was before we moved. And he thought it was his bank statements, you know, what you have a stamp for the—

Q. Asher thought that?

A. Yes, Mr. Asher, and he came in and said, "I just found this." And I looked and I said, "Okay. Give it to me." And I talked to—I went into Ralph's office and I don't remember if it was right at the—I don't even know if Ralph was there or—as soon as I saw Ralph I talked to Ralph about it and I told him it was behind there and he said, "Who does it belong to"? And I said, "It could be anybody's." I said that I had an idea who it belonged to, but I wasn't sure. This was my own idea.

. . . . .

Q. Why don't you first describe what it was that you said and—

A. It's a blank registration, a Maine car registration and they are blank and then there was a stamp that—you know, when you would go to the registry in Maine to get a duplicate, like, you know, when you lose your registration or if you need a registration you go to the State of Maine and they make up a registration for you and they stamp it and it says, "True copy, State of Maine" or something. I don't know, but it says something like that to verify that it's a true copy from the State of Maine. So he found it and I assumed that they used it—like, we used to have to send drivers up to Maine all the time to get copies of the registrations because in Maine—Maine only became a title state in 1975. So prior to 1975 you didn't get a title. Your registration was like a title.

If you registered the car you owned the car. It's your car. So any car prior to 1975—all you needed was a registration. And we found a stamp and the blank registrations. So we assumed that what they were doing is taking and making up registrations instead of sending the drivers because you had to pay the driver $35 to go up to Maine, plus the registration. So it was an expensive trip. You know, if you needed a lot of them you are paying $35 each time you send somebody up there. So to eliminate that we assumed that they were just making up their own registrations rather than having to send a driver up to Maine to get a copy of the registration. And I told Ralph this when we found all this and he was keeping it to sort of blackmail the person who stole the money.

A JUROR: Who is they?

THE WITNESS: They?

A JUROR: Who is they, the people who you are talking about, the people that were doing this?

THE WITNESS: I don't know. In fact, I don't know if it's him. I am assuming it's him.

A JUROR: Who is him?

THE WITNESS: I don't know if I should say because what if it's not him? I don't

want to incriminate anybody. I don't want to accuse—you know, I have to live with my conscience. I don't want to accuse anybody unjustly; all right? I mean, I am here to tell the truth and I am telling the truth as I see it and as I saw it, but I don't want to say, "Well, this person I believe is doing this." Because once you say something like that, even if you are just assuming it, the words are out and it instills in people's minds that there is a possibility that the person was doing it. I wouldn't want to do that to anybody. I don't want to do that to anybody.

    *     *     *     *     *     *

Q. There was also microfilm, wasn't there?

A. That was in an envelope and you can't see it unless you have a machine. It was microfilm. It was 5 × 7 or something.

Q. What was the microfilm for?

A. It was Maine registrations.

Q. It had all the people in Maine who had registrations?

A. Yes.

Q. So if you had—

A. Well, that's what it said on top of the microfilm. You can't—I held it up to the light and looked and you can't read anything. You need a special machine. I mean, it's so small you can put thousands on one—a little film. You know, the human eye—you have to have the thing, the microscope.

Q. Do you know the reason why they used the microfilm for Maine titles?

A. I just assumed it was to save a trip for the drivers. Then again, that's my assumption again. It would save the drivers money. You know, you have to pay $35 for a driver to go up and get a copy of the registration.

Q. Would it surprise you to learn that they sold cars—

A. Yes, you told me that before. After you told me that then you gave me another idea to think about.

Q. What idea was that?

A. That they could have—you said they could have taken the microfilm to falsi-fy—all right. Like, I make up a registration and you know who owns say, a '73 Buick and it's on the microfilm who owns that '73 Buick. So you make up that registration with the serial number to the car that you have. This is what you told me and it made sense to me. I hadn't thought about it before.

    *     *     *     *     *     *

Q. [t]he documents that you found in the back room, gave them the capability of manufacturing a title to reflect not the true title, but to reflect the information on that Concord Auto Auction statement; isn't that true?

A. Right. After you told me that, that does make sense. I have to agree with that, that it does. I just thought that they were saving $35 on a driver and—

    *     *     *     *     *     *

Q. Did you have any conversations with anyone at anytime that could shed light as to who used those files?

A. No. I wouldn't, because you see, I didn't want to discuss anything. It was none of my business. I didn't want to get involved in it. I was there three or four hours a day if that and I did my job and I left. I didn't care what went on after I left or before I got there. I just cared about doing what I was supposed to be doing and I didn't care what anybody else was doing if it didn't concern me.

Q. Did you ever see anyone at Auto Alley using that type of stamp or looking at the microfilm or a microfilm?

A. No, because you need a machine. We didn't have that type of machine. We didn't have a microfilm machine because like I said I took it and looked up and there is no way you can read it.

    *     *     *     *     *     *

Q. What caused you to believe that Walter Harlan's—

A. I didn't say it was Walter Harlan. You just said it was Walter Harlan.

Q. I know. I am somewhat intuitive. What caused you to believe it was Walter Harlan's stuff?

A. I didn't say it was Walter Harlan's stuff and I just don't know, maybe intuition. I don't know. I really don't know. I know that when I found them I kept trying to decipher what was going on and I played around with them and—you know, copied different things and I told Ralph about it and we were deciphering it. We had it on his desk and it was a big mess. You know, it was all folders and different things and I was trying to sort everything out and marking them and putting them in envelopes so they could have it at least in order so if he wanted to use it for his little threat or whatever.

3. The aforesaid testimony of DEE ROCCA, as she then and there well knew and believed, was false in that DEE ROCCA knew that the "State of Maine True Copy" stamps belonged to Walter Harlan and that said stamps as well as the Maine microfilm records were used by Auto Alley to create fictitious Maine registrations for motor vehicles the odometers of which had been reset and altered.

In violation of Title 18, United States Code, Section 1623.

## APPENDIX 2
### COUNT XI

1. On or about September 23, 1981, in the District of New Hampshire, DEE ROCCA, the defendant, while under oath as a witness at a suppression hearing in a criminal case then being held before the United States District Court for the said District, entitled *United States v. Walter Harlan, et al.,* Criminal No. 81–26–D, knowingly did make a false material declaration, that is to say:

2. At the time and place aforesaid, the Court was engaged in a hearing on motions to suppress evidence which had been filed by Ralph Alley, a defendant therein.

3. It was a matter material to said hearing to determine the nature and extent of Ralph Alley's interest in, knowledge of, and connection with certain "State of Maine True Copy" stamps which were seized from the residence of DEE ROCCA on or about January 9, 1980.

4. At the time and place aforesaid, DEE ROCCA, while under oath, did knowingly declare before said Court with respect to said material matter, as follows:

Q. Mrs. Rocca, I'm going to show you what's been marked for identification as Government Exhibits 3 and 4 and ask you if you are familiar with those stamps.

A. Yeah, yes.

Q. And would you tell us the circumstances under which you became familiar with the stamps.

A. O.K. They were found in the garage at 170 Valley Street, in the back of the garage in boxes.

Q. O.K. They were found by whom?

A. Mr. Asher.

. . . . .

Q. O.K. And when he found them, how did you become aware of it?

A. Well, he told me he found them in his file cabinet.

. . . . .

Q. And what did you do with it?

A. I showed it to Mr. Alley and Mr. Alley told me to hold onto it.

. . . . .

Q. You showed Mr. Alley the stamps.... He told you to hold on to them?

A. Yes, he had never seen them before. He was surprised when I showed it to him.

Q. He told you to hold onto them?

A. Yes.

Q. Then you took the stamps with the other records along to your house?

A. Yes, because I put the stamps in the box and when we got the other records to the house, there was two stamps. I don't know where the other one came from.

Q. O.K. Did you ever show the second stamp to Mr. Alley?

A. No. I—no.

Q. O.K. So as far as you know, Mr. Alley didn't even know there was a second stamp. Is that right?

A. I told him about the second stamp. I didn't show it to him.

Q. O.K. And he was surprised at that particular time?

A. He was surprised at the first stamp, yes, and he was surprised at the second stamp also, I guess. I don't know. I don't remember his reaction to the second stamp.

5. The aforesaid testimony of DEE ROCCA, as she then and there well knew and believed, was false in that both DEE ROCCA and Ralph Alley had seen the "State of Maine True Copy" stamps before the occasion referred to in the above testimony of DEE ROCCA, and both DEE ROCCA and Ralph Alley were aware prior to that occasion that such stamps were used by Auto Alley to create fictitious Maine registrations for motor vehicles the odometers of which had been reset and altered.

In violation of Title 18, United States Code, Section 1623.