UNITED STATES of America, Plaintiff,

v.

Fernando LOPEZ and Jico
Garcilazo, Defendants.

No. 85 CR 458.

United States District Court,
N.D. Illinois, E.D.

Nov. 15, 1985.

Anton R. Valukas, U.S. Atty. by Lawrence E. Rosenthal, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

Ronald A. Bredemann, Flood & Bredemann, Park Ridge, Ill., for defendant Lopez.

Francis A. Nolan, Chicago, Ill., for defendant Garcilazo.

## ORDER

BUA, District Judge.

Before the Court is the defendant Lopez's amended motion to quash his arrest and suppress certain evidence. For the reasons stated herein, defendant's motion is granted in part and denied in part.

## I. FACTS

The parties have stipulated to the following pertinent facts. At approximately 11:50 p.m. on March 12, 1985, Officer Richard Boyle of the Chicago Police Department and Special Agent Frank Tucci of the Federal Drug Enforcement Agency (DEA) observed a male individual deplane from Eastern Airlines, Flight 430. That individual was the defendant Fernando Lopez. Flight 430 originated in Miami, Florida. Lopez carried a black cloth shoulder bag. Officer Boyle and Agent Tucci approached the individual and identified themselves as police officers. Neither Tucci nor Boyle had ever seen Lopez before March 12, 1985, nor had they ever heard his name, nor had they received any reports of any drug shipments arriving from Miami on that flight, nor that an individual would be carrying any contraband on that flight.

For the purposes of this motion, the parties ask that the Court assume that there was a seizure of the shoulder bag and that the seizure was illegal. Inside the shoulder bag, Agent Tucci found approximately one kilogram of a mixture that appeared to contain cocaine. A field test indicated that the mixture did in fact contain cocaine.

Lopez was placed under arrest and processed by the arresting officers. While processing the defendant, the arresting officers made various statements: that, if defendant was turned over to state authorities, he could be prosecuted for delivery of

cocaine and receive a minimum sentence of six years in prison without the possibility of probation; and that the minimum bail allowed him in state court would be $50,-000, or $5,000 in cash.

On March 12, 1985, subsequent to his arrest and the above statements, Lopez, while being fingerprinted at the O'Hare International Airport office of the DEA, expressed his willingness to cooperate with the DEA. Lopez stated that he had been hired in Miami by a man named Leon and was being paid $1,500 to deliver a kilogram of cocaine to a buyer in Chicago named Paul. Lopez agreed to contact Paul at the telephone number he had been given by Leon, and participate in a controlled delivery of the cocaine to Paul.

On March 28, 1985, as a direct result of Lopez's cooperation with the government, Leon Binkiewicz and Paul Pauluzzi were charged with narcotics violations under 21 U.S.C. §§ 841(a)(1), 843(b) and 846. Both of these individuals subsequently agreed to cooperate with the government. When they were both debriefed by the government, both individuals named Jico Garcilazo as a member of the cocaine distribution system as alleged in the indictment.

During the course of Lopez's cooperation with the government, he was not represented by counsel prior to March 25, 1985. Pursuant to a subpoena served upon him by the government, Lopez was to appear before a Special Grand Jury on March 28, 1985. On March 25, 1985, Lopez met with counsel Patrick Coffey of the Federal Defender Program, who was appointed to represent Lopez in pending Grand Jury proceedings. No charges were filed against Lopez and he had remained at liberty from the point of his arrest on March 12, 1985 until his subsequent arrest on July 18, 1985. By letter dated March 25, 1985, the government, through Assistant U.S. Attorney Scott F. Turow, memorialized the pretrial diversion agreement that it had reached with Lopez and his attorney.

Pursuant to that agreement, the government agreed to stop investigating Lopez further with respect to unlawful possession and distribution of cocaine and to place him on 18 months probation. If the government determined that Lopez had not testified truthfully in the grand jury proceedings and any resulting trials, the letter reserved the government's right to prosecute Lopez at that time for perjury or false statement and for any other crimes he may have committed. In addition, the letter stated the government's position that it would be free to use any statements Lopez has made or will make against him in such a prosecution. A formal pretrial diversion agreement was executed thereafter.

Lopez was debriefed by DEA agents and Assistant U.S. Attorney G. Ferguson on March 26, 27 and 28, and Lopez testified before the Grand Jury on March 28. During the debriefings and testimony, Lopez made inculpatory statements and at all times he was at liberty to consult with his attorney.

After debriefing Leon Binkiewicz and Paul Pauluzzi, the DEA agents recontacted Lopez, who denied knowing that Jico Garcilazo was involved in the conspiracy. Pursuant to his plea agreement, Binkiewicz cooperated with the government and met with Lopez on July 10, 1985. At the time of this conversation between Binkiewicz and Lopez, the government believed that Lopez had knowledge of the role played by Garcilazo in the alleged conspiracy.

On July 16, 1985, Lopez returned to Chicago at the government's request in order to testify again before the Grand Jury. At this time the government knew that Lopez had knowledge concerning Garcilazo and, in fact, Lopez was the target for the Grand Jury investigation. On July 17, Lopez was questioned by DEA agents and Assistant U.S. Attorney Ferguson. Lopez was not informed that he was the target of an investigation, nor that the DEA or the government believed that he had in fact breached any portion of his pretrial diversion agreement. Patrick Coffey, Lopez's attorney was not informed of this interview. At the interview, Lopez again made inculpatory statements and denied knowing that Garcilazo was a member of the alleged

conspiracy, which was then a subject of the investigation before the Grand Jury. On July 18, 1985, Lopez testified before the Grand Jury.

After testifying before the Grand Jury, Lopez was escorted by a DEA agent to the office of Assistant U.S. Attorney Ferguson. After waiting there for approximately 45 minutes, at approximately 4:00 p.m., Lopez was confronted by Assistant U.S. Attorney Larry Rosenthal, Ferguson, and DEA Agents Tucci and William Furay. Lopez was told by Rosenthal that he had "blown it," that he was going to jail, and that he would lose his job. Further, Rosenthal told Lopez that the only way he would get any further consideration was to tell the truth, cooperate with the government and stop lying. This exchange lasted for approximately one-half hour, at which time Lopez made inculpatory statements. The other individuals left Lopez in Ferguson's office with a DEA agent. Lopez also made inculpatory statements to the DEA agent and admitted that he had lied before the Grand Jury.

Subsequent to his second Grand Jury appearance, Lopez was not informed of his *Miranda* rights nor informed that he was in the government's custody. Immediately after making inculpatory statements to the DEA agent, Lopez was taken to the United States Marshal's office, where he was fingerprinted, processed, and placed in incarceration. After Lopez made the inculpatory statements to the DEA agent and before being fingerprinted and processed, Federal Defender Coffey was contacted and allowed to speak to Lopez.

Prior to making any inculpatory statements before the Grand Jury on July 18, 1985, Lopez was not in custody. However, he was the subject of an obstruction of justice investigation at that time. He was not informed that he was the subject of that investigation, nor was his attorney informed of that fact prior to his testimony before the Grand Jury. The first time that Coffey was notified of Lopez's presence in Chicago was after his arrest on July 18, 1985. Prior to that arrest, no agent of the government attempted in any way to prevent Lopez from contacting Coffey.

## II. DISCUSSION

For the purposes of this motion to suppress, the parties agreed that this Court should assume that the seizure of the shoulder bag from defendant Lopez on March 12, 1985 was an illegal seizure. In support of his motion to quash his arrest and suppress the evidence gained therefrom, the defendant Lopez sets forth three grounds: (A) all of his statements should be suppressed as the fruit of his illegal arrest; (B) his testimony before the Grand Jury on July 18, 1985 should be suppressed because he and his attorney were not informed that he was the target of an investigation; and (C) his statements made subsequent to his Grand Jury testimony on July 18, 1985 should be suppressed because they were the product of a custodial interrogation performed without notifying his counsel or giving him his *Miranda* warnings.

### A. *Fruit of the Poisonous Tree*

#### (1) *Statements Made From March 12 Through March 14*

Defendant Lopez argues that all of his statements made after his illegal arrest and the illegal seizure should be suppressed as the fruit of an illegal arrest and seizure. He contends that the statement made to the DEA agent at the time of his arrest on March 12, 1985 should be suppressed because it was the direct product of his illegal arrest and no intervening fact or event occurred which would purge the statement of the primary taint of the illegal arrest. Lopez also asserts that his incriminating acts and statements made between March 12 and 14, when he cooperated with the DEA agents to complete the sale of the cocaine, should be suppressed. In its brief in opposition to defendant's motion, the government does not contest the exclusion of the statements made from March 12 through March 14.

Assuming the illegality of the seizure of the shoulder bag, the Court agrees with the defendant that no intervening event

occurred to purge those statements, even in the context of defendant's cooperation, from the primary taint of the illegal seizure. Even though the statements may be voluntary within Fifth Amendment standards, the causal connection for Fourth Amendment purposes still exists between the illegality of the arrest and the statements made between March 12 and 14. *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). Therefore, defendant's statements made between March 12 and 14 are suppressed.

#### (2) *Statements Made After The Pretrial Diversion Agreement*

Defendant Lopez appears to argue that, since he would not have cooperated by entering into a pretrial diversion agreement but for the illegal arrest and seizure, any statements made after execution of the pretrial diversion agreement should be suppressed. Presumably, these statements include his testimony before both Grand Juries, as well as statements made during debriefing with DEA agents. The government counters that the pretrial diversion agreement and other facts constitute an act of voluntariness sufficient to purge these later statements and Grand Jury testimony of the primary taint of the illegal search and seizure.

■ The test for whether statements made after the accused has been subjected to an illegal search and seizure must be suppressed was stated by the Supreme Court in *Taylor v. Alabama*, 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982): "a confession obtained through custodial interrogation after an illegal arrest should be excluded unless intervening events break the causal connection between the illegal arrest and the confession so that the confession is 'sufficiently an act of free will to purge the primary taint.'" *Id.* at 690, 102 S.Ct. at 2667 (quoting *Brown v. Illinois*, 422 U.S. 590, 602, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975)). Thus, the question is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead

by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). *See also Segura v. United States*, —— U.S. ——, 104 S.Ct. 3380, 3386, 82 L.Ed.2d 599 (1984); *Brown*, 422 U.S. at 599, 95 S.Ct. at 2259. In determining whether challenged evidence is a product of exploitation of illegality, the line between exploitation and an act of free will which purges the taint must be drawn by reference to the underlying purpose of the exclusionary rule. *Dunaway v. New York*, 442 U.S. 200, 210, 217–18, 99 S.Ct. 2248, 2255, 2259, 60 L.Ed.2d 824 (1979); *Brown*, 422 U.S. at 599–600, 95 S.Ct. at 2259–2260. One purpose is to deter further illegal searches and seizures.

■ In the present case, Lopez was released from custody on March 14, 1985 and continued to cooperate with the government even though there were no formal charges against him. During this time from March 14 to March 25, Lopez consulted with his appointed attorney, Patrick Coffey. After these consultations, Lopez and his attorney entered into an agreement with the government in which he promised to cooperate truthfully in exchange for 18 months of probation and cessation of any further investigation into his activities. Lopez knew that the government's promises were conditioned on his truthfulness and his failure to testify truthfully could lead to investigation and prosecution based on statements made under the pretrial diversion agreement. Given the facts that Lopez was not in custody for 11 days prior to executing the pretrial diversion agreement and that he had the assistance of counsel prior to and during the execution of the agreement, the Court finds that Lopez's execution of the pretrial diversion agreement and his cooperation thereunder constitute an act of free will sufficient to purge these later statements from the primary taint of the illegal arrest and search. *Taylor*, 457 U.S. at 690, 102 S.Ct. at 2666; *Brown*, 422 U.S. at 602, 95 S.Ct. at 2261.

Lopez's attempt to argue that, but for the initial illegal arrest and seizure, he would never have had to enter into the pretrial diversion agreement or cooperate in any way with the government, has been rejected by the Supreme Court, *see Segura,* 104 S.Ct. at 3391–92; *Dunaway,* 442 U.S. at 217–18, 99 S.Ct. at 2259; *Brown,* 422 U.S. at 603–04, 95 S.Ct. at 2261–62; and is likewise rejected here. Therefore, the Court finds that the connection between the arrest and seizure and the statements made after the pretrial diversion agreement has "'become so attenuated as to dissipate the taint.'" *Wong Sun,* 371 U.S. at 491, 83 S.Ct at 419 (quoting *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 267, 84 L.Ed. 307 (1939)). Accordingly, the Court holds that the statements made after the execution of the pretrial agreement and pursuant to the cooperation thereunder are not suppressed.

In further support for this holding, the Court finds that suppression of these later statements would not deter further illegal searches and seizures and therefore would not further the purposes of the exclusionary rule. This finding is supported by the fact that the defendant here had a choice between cooperating with the government after his release from custody or not cooperating and thereby rely on the illegality of the arrest and seizure as a defense to any subsequent formal charges. *United States v. Stevens,* 612 F.2d 1226, 1230 (10th Cir. 1979), *cert. denied,* 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1113 (1980) (plea bargain). Once having made this choice, the defendant should not be allowed to go back on his deal, depriving the government of the benefit of the bargain, and then accuse the government of exploiting his initial illegal arrest and seizure in order to elicit these later statements. *See United States v. Stirling,* 571 F.2d 708 (2d Cir.), *cert. denied,* 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978).

In *Stirling,* one defendant voluntarily negotiated a plea agreement and voluntarily decided to violate the agreement. 571 F.2d at 732. The Second Circuit Court of Appeals noted that the defendant "could

have relied on the agreement to protect himself." *Id.* The Second Circuit rejected the attempt to preclude use of the information given by the defendant to the Grand Jury pursuant to the plea agreement which he voluntarily violated.

▮ Finally, it is clear that Binkiewicz's statements and his tape-recorded conversation with Lopez are admissible as the voluntary statement of an accomplice. If Binkiewicz freely and voluntarily consented to the tape recording, the tapes of the conversation with Lopez are admissible. *United States v. Wallace,* 597 F.2d 641, 642 (8th Cir.1979) (Citations omitted). Lopez could argue that Binkiewicz's statements and consent, made pursuant to a plea bargain agreement, would never have occurred if Lopez had not been illegally arrested and searched. However, Lopez's voluntary implication of Binkiewicz under his pretrial diversion agreement so attenuates the connection between the illegal arrest and seizure and Binkiewicz's plea agreement and consent thereunder that Binkiewicz's consent to the tape-recorded conversation and his other statements are purged of any taint from Lopez's arrest and seizure. Therefore, the tape-recorded conversation and Binkiewicz's statements, as well as Pauluzzi's, are not suppressed.

B. *Failure To Warn Defendant That He was The Target Of An Investigation Prior To Second Grand Jury Appearance*

Defendant Lopez seeks either dismissal of the perjury count or suppression of his Grand Jury testimony on the ground that he and his attorney were not advised that Lopez was a target of the Grand Jury's investigation prior to his appearance. In support of this argument, Lopez asserts that the government knew that he had lied, knew that he was now the target of the Grand Jury investigation, and had reason to believe that he would lie before the Grand Jury and be indicted by it since he had now violated the terms of his pretrial diversion agreement. Finally, Lopez as-

serts that the government knew that he was represented by an attorney and did not inform his attorney of Lopez's presence before the Grand Jury or that he was a target.

 In determining whether testimony given by a Grand Jury witness could be used against him in a subsequent prosecution, the test for admissibility is not the absence of a "target" warning, but "whether, considering the totality of the circumstances, the free will of the witness was overborne." *United States v. Washington*, 431 U.S. 181, 188, 97 S.Ct. 1814, 1819, 52 L.Ed.2d 238 (1977); *see also United States v. Wong*, 431 U.S. 174, 97 S.Ct. 1823, 52 L.Ed.2d 231 (1977). In *Wong* the defendant was a target of an investigation into bribery and was indicted for perjury, while in *Washington* the defendant was indicted for theft, for which he was the target suspect. *Wong* and *Washington* reject the contention that there is a due process obligation to do anything more than inform the witness of the dangers of testifying falsely by administering an oath. *United States v. Crocker*, 568 F.2d 1049, 1055 (3d Cir.1977).

In *Crocker*, the defendant was warned of the possibility of prosecution for perjury if he testified falsely. The Third Circuit Court of Appeals held that, while the Assistant U.S. Attorney may have misled the defendant's attorney by suggesting that his client was not a target at the time of the second Grand Jury appearance, the alleged misleading statements were not a due process violation. *Id.* at 1056. The Third Circuit noted that, had the Assistant U.S. Attorney revealed information that defendant had lied in a prior Grand Jury appearance, defendant's attorney might have urged his client to plead the Fifth Amendment's privilege against self-incrimination. Important factors in the Third Circuit's decision were the warnings actually given to the defendant and his knowledge of the subject of the Grand Jury investigation. *Id.*

 In the present case, Lopez knew from the oath administered at the second Grand Jury appearance and from the terms of the pretrial diversion agreement that he might be prosecuted for his statements if he did not tell the truth. Lopez also knew that his cooperation under the agreement was sought in connection with investigating the alleged cocaine conspiracy and the identity of its participants. The tape-recorded conversation between Binkiewicz and Lopez bears out the fact that Lopez knew that he would be asked about Garcilazo's involvement in the alleged cocaine conspiracy. In addition, one can ·infer from this conversation that Lopez planned to deny Garcilazo's involvement in the alleged cocaine conspiracy. Therefore, under *Wong, Washington,* and *Crocker,* the Court finds that the failure to warn the defendant that he was the target of an investigation prior to his second Grand Jury appearance is not a due process violation. Furthermore, given the above findings, there is no question that Lopez is not allowed to commit perjury even as a victim of an illegal arrest or search. *United States v. Finucan*, 708 F.2d 838, 845 (1st Cir.1983). Accordingly, the Court holds that defendant's statements made at his second Grand Jury appearance are not suppressed.

### C. *Custodial Interrogation After The Second Grand Jury Appearance*

 Defendant argues that his statements made subsequent to his Grand Jury testimony on July 18, 1985 should be suppressed because, at that time, he was subjected to custodial interrogation and should have received the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The Supreme Court has provided a straightforward test for determining whether an individual is in custody for purposes of receiving his *Miranda* warnings: "The ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3519, 77 L.Ed.2d 1275 (1985) (per

curiam) (quoting *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977) (per curiam). The parties' stipulation contains the following pertinent facts. After he completed his testimony, Lopez was taken to the U.S. Attorney's Office and asked to wait in the office of Assistant U.S. Attorney Ferguson. After about 45 minutes he was confronted by Rosenthal, Ferguson and two DEA agents, and at that time was told that the government knew that he had lied to the Grand Jury. At that time, Lopez made inculpatory statements. After the interview was completed, Lopez was given an opportunity to consult with his attorney. He was subsequently formally arrested and taken to the United States Marshal's Office for processing. At no time during this meeting with Rosenthal, Ferguson, and the agents was Lopez told that he was in custody, nor was he told that he was not free to leave.

In light of the above facts, the Court finds that Lopez was not in custody at the time of the above accusations. In addition, Lopez should have known that anything he said, after being informed that the government knew he had lied, could be used against him according to his pretrial diversion agreement. Finally, Lopez's past cooperation, which was part of his release under the agreement, further persuades the Court that defendant was not in custody during the accusations. *See Minnesota v. Murphy,* 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984) (questioning of probationer by probation officer, including accusations, did not mean that probationer was in custody). Accordingly, the Court holds that Lopez's statements made subsequent to his second Grand Jury appearance are not suppressed.

### III. CONCLUSION

For the reasons stated above, the Court finds the following statements are admissible and denies defendant's motion to suppress as to them: (1) Lopez's statements made after the execution of his pretrial diversion agreement; (2) all statements made by Binkiewicz and Pauluzzi; (3) Lo-pez's testimony before the Grand Jury on July 18, 1985; and (4) Lopez's statements made subsequent to his July 18 appearance before the Grand Jury. The Court grants defendant's motion to suppress Lopez's statements made between the time of the illegal arrest and seizure and the execution of the pretrial diversion agreement.

IT IS SO ORDERED.